**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, 1101 K Street, N.W., Suite 201 Washington, DC 20005 ) ) ) ) ) | |
| NATIONAL SECURITY ARCHIVE, Gelman Library George Washington University 2130 H Street, N.W., Suite 701 Washington, DC 20037 ) ) ) ) ) ) | Civil Action No. _____ |
| SOCIETY FOR HISTORIANS OF AMERICAN FOREIGN RELATIONS, Department of History Middle Tennessee State University 1301 East Main Street, Box 23 Murfreesboro, TN 37132 ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | |
| DONALD J. TRUMP, in his official capacity as President of the United States 1600 Pennsylvania Avenue, N.W. Washington, DC 20503 ) ) ) ) ) ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, 725 17th Street, N.W. Washington, DC 20503 ) ) ) ) ) | |
| Defendants. ) ) | |

**COMPLAINT**

1.     This is a civil action for declaratory, injunctive, and mandamus relief to address a

policy and practice of violating the Presidential Records Act, 44 U.S.C. §§ 2201–2209 ("PRA"),

the Federal Records Act ("FRA"), 44 U.S.C. §§ 3101, *et seq.*, and Article II, Section 3 of the

Constitution, which imposes on the President a duty to "take care that the laws be faithfully executed[.]" Plaintiffs challenge: (1) the failure of President Donald J. Trump and the Executive Office of the President ("EOP") to comply with their mandatory, non-discretionary duties under the PRA, including their failure to create and preserve records of the meetings and discussions the President and other senior White House staff have with foreign leaders; (2) the classification of the notes of an interpreter employed by the State Department as well as all other information shared in the President's meetings and discussions with foreign leaders as presidential records beyond the reach of the Freedom of Information Act ("FOIA"), in violation of the PRA and FRA; (3) the failure of President Trump, his staff, and the EOP to solicit the views of the Archivist of the United States ("Archivist") in writing and to transmit to Congress a disposal schedule prior to disposing of presidential records; and (4) President Trump's violation of his constitutional obligation to take care that the laws—including the PRA and the FRA—are faithfully executed.

2.     The PRA, enacted in the wake of President Nixon's resignation and attempt to seize control of his presidential records, reflects Congress's judgment that presidential records are owned by the United States on behalf of the American people. Toward that end, Congress required that essential records of the President's business be created in the first place. Specifically, the PRA mandates that "[t]hrough the implementation of records management controls and other necessary actions, the President shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law." 44 U.S.C. § 2203(a). Together

with the PRA's imposition of restrictions on the President's ability to destroy his or her records, this dictate is the first and most critical step in creating a public historical record of a presidency.

3.     Congress also codified the public's right of eventual access to the records of a president. Beginning as early as five years after a President leaves office, members of the public may file FOIA requests seeking that president's records. 44 U.S.C. § 2204. Failure to record and preserve the essential activities, deliberations, decisions, and policies of a presidency, as the PRA requires, places that information forever beyond the reach of the public. The public's rights of ownership and access are meaningless if there is no mechanism to enforce the president's congressionally-imposed obligation to create those records in the first place.

4.     Likewise, Congress enacted and amended the FRA to assure "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," and "[j]udicious preservation and disposal of records." 44 U.S.C. §§ 2902(1), (5). To achieve this result, the FRA requires that "[t]he head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency . . . ." 44 U.S.C. § 3101. Conversely, the head of each agency "shall notify the Archivist of any actual, impending, or threatened unlawful removal, . . . deletion, erasure, or other destruction of records in the custody of the agency, and with the assistance of the Archivist shall initiate action through the Attorney General for the recovery of records the head of the Federal agency knows or has reason to believe have been unlawfully removed from that agency . . . ." 44 U.S.C. § 3106(a). If the head of an agency does not follow the requirements of 44 U.S.C. § 3106(a), "the Archivist shall request the Attorney General to initiate such an action, and shall notify the Congress when such a request has been made." 44 U.S.C. § 3106(b).

3

5.     The public or other interested parties may request the disclosure of agency records subject to the FRA through the FOIA. *See* 5 U.S.C. § 552(a), (f). The FOIA's purpose is completely undermined when records that should be accessible through this mechanism are never preserved. Further, improperly classifying records as presidential, and not federal agency records, removes them from agency control and the reach of the FOIA while a President is in office.

6.     The PRA's and FRA's mandates have particular force now, when the need for accurate records of U.S. foreign policy could not be greater. Creating records of U.S. foreign policy is critical to ensure that private researchers and historians have access to the documentary history of this presidency and to ensure that the critical checks and balances built into our system function as the founders intended. The creation of a record of President Trump's meetings with foreign leaders also is critical for our government to carry out an effective foreign policy. The next individual who becomes President should not be left to guess what promises or deals President Trump made on behalf of the American people when President Trump was performing a core constitutional duty.

7.     As numerous news reports document, however, President Trump has had at least five separate meetings with Russian President Vladimir Putin without note takers present, meaning that no official U.S. record of those meetings exists. In addition, on at least one occasion President Trump confiscated a State Department interpreter's notes after a secret meeting with President Putin in Germany and ordered the interpreter not to disclose to anyone what he had heard. More recently, President Trump had a one-on-one meeting in Vietnam with North Korea's leader Kim Jong-Un with only two interpreters present, apparently leaving no U.S. record of this interaction.

8.      These recordkeeping failures apparently extend to other White House officials like Senior White House Adviser Jared Kushner, who in a recent meeting with top Saudi officials excluded State Department officials, thereby avoiding the creation of a record of his conversations. The absence of records in these circumstances when the President and his top advisers are exercising core constitutional and statutory powers causes real, incalculable harm to our national security and the ability of our government to effectively conduct foreign policy because the documentary record of this administration's foreign policy regarding Russia, North Korea, and Saudi Arabia will be unavailable to policy makers and forever lost to history.

9.      Beyond presenting a national security matter of deep concern, the actions of the President and his top aides violate both the PRA the FRA, and the Constitution's Take Care Clause and deprive Plaintiffs and the public of the valuable records of this presidency. Their policy and practice of failing to create—or affirmatively directing others not to create—records of meetings with Putin, Kim Jong-Un, Saudi officials, and possibly others will harm Plaintiffs' attempts to understand this presidency and help articulate and educate the public on what lessons should be learned. Absent the requested relief, the loss of these records likely will continue and create a growing hole in the historical record of the presidency.

## JURISDICTION AND VENUE

10.     This Court has personal and subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States); 44 U.S.C. §§ 2201– 2209 (the PRA); 28 U.S.C. § 1361 (mandamus); and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act).

11.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(e).

5

## PARTIES

12.     Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a nonprofit, non-partisan corporation, organized under section 501(c)(3) of the Internal Revenue Code. CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials. To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to the public about public officials and their actions. CREW researches and reviews information made available to the public under the FRA and PRA, including records of former presidents, and uses the FOIA to obtain information about the government critical to its mission and purpose. CREW has filed hundreds of FOIA requests since the start of the Trump administration, including with those EOP components subject to the FOIA.

13.     CREW also has a longstanding interest in government compliance with recordkeeping laws, including the PRA and the FRA. CREW has brought numerous lawsuits to compel compliance with these laws, including a lawsuit pending in the U.S. Court of Appeals for the D.C. Circuit, *CREW v. Trump*, No. 18-5150 (D.C. Cir.), that challenges the failure of the President and EOP to comply with the mandatory, non-discretionary duties the PRA imposes on them. CREW's interest in the preservation of presidential records also is evidenced by CREW's 2007 litigation of whether the EOP's Office of Administration is an agency subject to the FOIA, *see Citizens for Responsibility & Ethics in Washington v. Office of Admin.*, 559 F. Supp. 2d 9 (D.D.C. 2008), *aff'd*, 566 F.3d 219 (D.C. Cir. 2009); a report entitled "Without a Trace: The Story Behind the Missing White House E-Mails and the Violations of the Presidential Records Act," *see* https://www.citizensforethics.org/press-release/crew-releases-new-report-without-a-trace-the-missing-white-house-emails-vio/ (last visited April 30, 2019); and a 2015 FOIA request

to the George W. Bush Presidential Library seeking the production of all records of communications between August 1, 2005 and February 1, 2007 between the White House and Republican Members of the House that referred, mentioned, or pertained to then-Representative Mark Foley.

14.     CREW will continue its practice of submitting FOIA requests for documents from executive branch agencies on matters that relate to CREW's ongoing research, litigation, advocacy, and public education efforts. CREW also anticipates that it will file FOIA requests for presidential records from this administration once they become available pursuant to the FOIA. Failure to create presidential records and improper classification of agency records as presidential records harms CREW by preventing or delaying CREW's access to agency and presidential records. A president's failure to obtain the Archivist's approval in writing and to submit a disposal schedule to Congress prior to disposing of presidential records deprives CREW of an opportunity to learn of improper disposal decisions until long after they occur.

15.     Plaintiff National Security Archive ("the Archive"), founded in 1985 by journalists and scholars to check rising government secrecy, combines a unique range of functions: investigative journalism, a research institute on international affairs, and a library and archive of declassified U.S. documents that is often considered the world's largest nongovernmental collection of such materials. The Archive is located at the George Washington University, and is one of the leading non-profit users of the FOIA. In these roles, the Archive has established an extraordinary track record of highly credible, award-winning investigative journalism and scholarship, including receipt of the George Polk Award in 2000 for "piercing self-serving veils of government secrecy, guiding journalists in search for the truth, and informing us all." Together with its founding director Scott Armstrong, the Archive brought the

series of lawsuits against the Executive Office of the President that resulted in the recognition that White House email record-keeping practices and guidelines are subject to judicial review.

16.     Since its founding, the Archive has filed over 1300 FOIA and declassification review requests with the Truman, Eisenhower, Kennedy, Johnson, Nixon, Ford, Carter, Reagan, George H.W. Bush, Clinton, and George W. Bush Presidential Libraries. The documents released in response to these requests have illuminated United States foreign policy and national security history since the Second World War. Among other things, the documents the Archive acquired from these presidential libraries have shed light on the Cuban Missile Crisis, the origins of the Vietnam War, President Nixon's opening to China, communications between the Soviet Union and the United States throughout the Cold War and as the Cold War ended, and the U.S. role during the human rights atrocities in the former Yugoslavia and Rwanda. Continued access to a full historical record of each modern presidency is critical to the Archive's work. The Archive intends to file requests with the Trump Presidential Library as soon as is legally permitted, likely on a range of topics covering the Trump presidency's foreign policy.

17.     Archive staff have published books based on records of former presidents. For example, Archive Executive Director Thomas S. Blanton and Archive Senior Analyst Dr. Svetlana Savranskaya have published two books based on head-of-state meeting transcripts from the Reagan and George H.W. Bush libraries combined with others from Soviet archives. One volume, also co-authored with Dr. Vladislav Zubok, analyzed the fall of the Berlin Wall in 1989 based on documents of heads-of-state meetings, and the other published and analyzed a complete series of the Reagan and Bush superpower summit meeting transcripts with then-Soviet leader Mikhail Gorbachev. Their future plans include filing FOIA requests for presidential records from the Trump administration as soon as they are legally permitted on a range of topics that likely

will include U.S. relations with Russia and China, U.S. military action in Africa, the role of foreign lobbyists, and the nuclear escalation between North Korea and the United States.

18.     Another Archive staffer, Senior Analyst William Burr, has published books and other writings drawing on declassified records of presidential meetings with foreign leaders. One book, *The Kissinger Transcripts: The Top Secret Talks with Beijing and Moscow* (New Press 1998), published for the first time the White House record of President Richard Nixon's meeting with Mao Zedong in February 1972. Another book, *Nixon's Nuclear Specter: The Secret Alert of 1969, Madman Diplomacy, and the Vietnam War* (University Press Kansas 2015), drew upon records kept by National Security Adviser Henry Kissinger of his meetings and telephone conversations with President Nixon. Other publications, such as edited collections of documents posted on the Archive's website, have included declassified records prepared by State Department and White House officials of presidential meetings with foreign leaders.

19.     Plaintiff Society for Historians of American Foreign Relations ("SHAFR") is a professional society dedicated to the study of U.S. foreign relations. On behalf of its nearly 1,000 members, it advances its mission "to promote the study, advancement and dissemination of knowledge about U.S. foreign policy" by awarding research grants and prizes, holding conferences, publishing an academic journal, *Diplomatic History*, and furthering archival access to government documents.

20.     SHAFR's members depend on preservation of and access to presidential records in order to present a full and accurate accounting of the past in their teaching, public speaking, exhibitions, and publications. SHAFR members have disseminated research findings to the public on the basis of archival research conducted in every presidential library. SHAFR members have filed many thousands of FOIA and mandatory declassification review requests with

presidential libraries and have long advocated for the preservation, declassification, and public availability of government records, notably including presidential records, because of the fundamental importance of these records for their investigation of the country's past.

21.     SHAFR members will begin using the internal diplomatic and national security records of the Trump administration as soon as they become available. They and their scholarship on the Trump administration will be substantially harmed by a failure to properly create and maintain key presidential records. Policymakers, national security personnel, political analysts, and the wider public rely on the archival research SHAFR members conduct on presidential records for evidence-based analyses of presidential decision-making and other topics of great importance to U.S. democracy. Without the proper creation and preservation of presidential records, SHAFR members will not be able to fulfill their professional responsibility to provide evidence-based assessments of the conduct of U.S. foreign policy during the Trump administration.

22.     SHAFR's journal *Diplomatic History* routinely publishes articles based on new research in presidential libraries, such as a 2017 article by Frédéric Bozo based on FOIA requests relating to Iraq from the Clinton Presidential Library. Recent books published by SHAFR members that are based on records in presidential libraries include Kelly J. Shannon's *U.S. Foreign Policy and Muslim Women's Human Rights*, which used Clinton Library records to trace that administration's global women's rights policies. Books by SHAFR members that rely heavily on accounts of conversations and meetings between U.S. presidents and foreign leaders include Jeffrey Engel's *When the World Seemed New: George H.W. Bush and the End of the Cold War*.

23.     For all Plaintiffs, access to presidential records is essential to fulfill their core missions. The ongoing failure of President Trump and his top advisors to create and preserve records of their conversations and meetings with certain foreign leaders and their actions that have prevented the State Department from creating and preserving its own records deprive, and will continue to deprive, the Plaintiffs of access to the documentary history of this presidency and administration. In the process, Plaintiffs and other members of the American public will lose vital information and insight into presidential policies and decision making, which are critical to interpret and prevent illegal or unwise government action.

24.     President Donald J. Trump is the President of the United States and is sued in his official capacity only. President Trump is subject to the requirements of the PRA, including the requirement that he take all necessary steps to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented, preserved, and maintained as presidential records. President Trump also has a unique responsibility as President to take care that laws including the PRA, FRA, and FOIA are faithfully executed.

25.     Defendant Executive Office of the President ("EOP") includes the agency known as the EOP and its individual components. With the exception of the Council on Environmental Quality, the Office of Management and Budget, the Office of National Drug Control Policy, the Office of Science and Technology Policy, and the Office of the United States Trade Representative, the EOP is subject to the PRA.

## STATUTORY FRAMEWORK

26.     Congress enacted the PRA in 1978 to ensure both "the preservation of the historical record of the future Presidencies" and "public access to the materials" of a presidency.

H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. § 2 (1978). Through the PRA and its predecessor

statute, the Presidential Recordings and Materials Preservation Act of 1974, Congress sought to

prevent a repeat of the protracted legal battle that ensued between the United States and

President Richard M. Nixon over the ownership and control of his presidential records after

leaving office.

27.     To preserve the historical record, the PRA directs the President as follows:

the President *shall* take all such steps as may be necessary to assure that the
activities, deliberations, decisions, and policies that reflect the performance of the
President's constitutional, statutory, or other official or ceremonial duties are
adequately documented and that such records are preserved and maintained as
Presidential records pursuant to the requirements of this section and other
provisions of law.

44 U.S.C. § 2203(a) (emphasis added).

28.     The PRA further specifies that "[t]he United States shall reserve and retain

complete ownership, possession, and control of Presidential records[.]" 44 U.S.C. § 2202.

29.     In imposing these requirements, Congress through the PRA recognized that with

the President, "a great number of what might ordinarily be construed as one's private activities

are, because of the nature of the presidency, considered to be of public nature, *i.e.*, they effect the

discharge of his official or ceremonial duties." H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. §§

11–12. Congress considered "few" of a president's activities to be "truly private and unrelated to

the performance of his duties[.]" *Id.* § 12.

30.     The PRA's definition of "presidential records" reflects this breadth by defining

presidential records as:

documentary materials . . . created or received by the President, the President's
immediate staff, or a unit or individual of the Executive Office of the President
whose function is to advise or assist the President, in the course of conducting
activities which relate to or have an effect upon the carrying out of the
constitutional, statutory, or other official or ceremonial duties of the President.

12

44 U.S.C. § 2201(2). The PRA also includes within the definition of "documentary material" "electronic or mechanical recordations." 44 U.S.C. § 2201(1).

31.     The PRA also defines what are *not* presidential records, a category that includes "any documentary materials that are . . . official records of an agency[.]" 44 U.S.C. § 2201(2)(B). The PRA cross-references the definition of agency records supplied by the FOIA, which makes clear that agency information made or received by an agency while conducting agency business is an agency record. 5 U.S.C. § 552(f). *See also* 44 U.S.C. § 3301 (defining federal record for purposes of FRA).

32.     The PRA imposes a multi-step process on the President before any presidential records can be destroyed. While in office, a President may dispose of his or her presidential records only after making an affirmative determination that the records "no longer have administrative, historical, informational, or evidentiary value[.]" 44 U.S.C. § 2203(c). After making that determination, the President must obtain the written views of the Archivist on the proposed destruction. 44 U.S.C. § 2203(c)(1)-(2). If the President receives written confirmation that the Archivist intends to take any action with respect to the proposed destruction, the President must notify the appropriate congressional committee of the president's intention 60 days before the proposed disposal. 44 U.S.C. § 2203(d). This process reflects the care Congress took to ensure that presidential records could be destroyed only after considered deliberation by multiple stakeholders.

33.     Presidential records ultimately are made available to members of the public, including Plaintiffs, through the FOIA. Once a President leaves office, the Archivist assumes custody and control over the former president's records. 44 U.S.C. § 2203(g). Beginning five years after a President leaves office, members of the public can begin filing FOIA requests for

13

presidential records. 44 U.S.C. § 2204(b)(2). Although some materials can be withheld or

redacted for an extended period of time, they too eventually become available to members of the

public, including Plaintiffs. 44 U.S.C. § 2204(a).

34.     The House Report on the PRA suggests that Congress intended the PRA to be

binding on the President. The report stated that the PRA "would terminate the tradition of private

ownership of Presidential papers and the reliance on volunteerism to determine the fate of their

disposition. Instead, the preservation of the historical record of the future Presidencies would

be *assured* and public access to the materials would be consistent under *standards fixed in law*."

H.R. No. 95-1487, 95th Cong., 2d Sess. § 2 (1978) (emphasis added). *See* Sara Worth, Trump

and the Toothless Presidential Records Act, *Yale Law School Media Freedom & Information*

*Access Clinic*, Mar. 11, 2019, *available at* https://law.yale.edu/mfia/case-disclosed/trump-and-

toothless-presidential-records-act.

35.     Agency records are subject to different records creation, maintenance, and

destruction rules codified in the FRA, 44 U.S.C. §§ 3101, *et seq*. For the purposes of the FRA,

the term records

> includes all recorded information, regardless of form or characteristics,
> made or received by a Federal agency under Federal law or in connection
> with the transaction of public business and preserved or appropriate for
> preservation by that agency or its legitimate successor as evidence of the
> organization, functions, policies, decisions, procedures, operations, or other
> activities of the United States Government or because of the informational
> value of data in them.

44 U.S.C. § 3301 (cross-referenced in and applied to chapter 31 of title 44 by 44 U.S.C.

§ 2901(1)).

36.     The FRA requires that the "head of each Federal agency shall make and preserve

records containing adequate and proper documentation of the organization, functions, policies,

decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. § 3101. The FRA further requires that the head of each agency establish a records management program, 44 U.S.C. § 3102; establish safeguards against the removal or loss of records, 44 U.S.C. § 3105; and "notify the Archivist of any actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion, erasure, or other destruction of records in the custody of the agency" and with the assistance of the Archivist "initiate action through the Attorney General for the recovery of records" unlawfully removed, 44 U.S.C. § 3106.

37.     The FOIA, enacted in 1966, established a statutory right of public access upon request to information held by Executive Branch agencies. Congress enacted the FOIA to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The FOIA carries a "strong presumption in favor of disclosure," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), and its "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act," *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

38.     Under the FOIA, virtually every record of a federal agency must be made publicly available, unless it is specifically exempted pursuant to one or more of the FOIA's nine exemptions. 5 U.S.C. § 552(b). Those government entities that fall outside the Administrative Procedure Act's definition of "agency," including the Office of the President, are not subject to the FOIA initially. *See, e.g.*, *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980). However, as described above, the public may request documents under FOIA

beginning five years after the conclusion of a president's term of office, or last consecutive term of office. 44 U.S.C. § 2204(a), (b)(2).

## FACTUAL BACKGROUND

39.     Accurate records of a president's interactions with foreign leaders are a matter of extreme importance for the nation's foreign policy and the historical record. Those interests are heightened in a presidency that has been marked by departures from the normal procedures of international diplomacy, including multiple reports of the refusal to create records of highest-level meetings, and significant divergences between the administration's version of a conversation and that of the foreign government involved.

40.     In May 2017, notable discrepancies appeared between the official readout of the President's meeting with Russian diplomats and reports that emerged later. As president, Mr. Trump met with Russian Foreign Minister Sergey Lavrov and then-Russian Ambassador Sergey Kislyak on May 10, 2017, in the Oval Office. The readout of the meeting released by the White House Office of the Press Secretary states that, among other topics discussed, President Trump "emphasized the need to work together to end the conflict in Syria," and "emphasized his desire to build a better relationship between the United States and Russia." Readout of President Donald J. Trump's Meeting with Foreign Minister Sergey Lavrov of Russia, May 10, 2017, *available at* https://ua.usembassy.gov/readout-president-donald-j-trumps-meeting-foreign-minister-sergey-lavrov-russia/.

41.     Several days later it was revealed that beyond what was in the readout, President Trump also disclosed highly classified "code-word" information to the Russian Foreign Minister and Ambassador. Greg Miller and Greg Jaffe, Trump revealed highly classified information to Russian foreign minister and ambassador, *Washington Post*, May 15, 2017, *available at*

https://www.washingtonpost.com/world/national-security/trump-revealed-highly-classified-information-to-russian-foreign-minister-and-ambassador/2017/05/15/530c172a-3960-11e7-9e48-c4f199710b69_story.html (last visited April 30, 2019). In addition, President Trump told the two Russians that his firing the previous day of FBI Director James B. Comey "had relieved 'great pressure'" and that he was "not under investigation." Matt Apuzzo, Maggie Haberman and Matthew Rosenberg, Trump Told Russians That Firing 'Nut Job' Comey Eased Pressure From Investigation, *New York Times*, May 19, 2017, *available at* https://www.nytimes.com/2017/05/19/us/politics/trump-russia-comey.html (last visited April 30, 2019).

42.     In July 2017, President Trump had his first reported face-to-face meeting with President Putin in Hamburg, Germany during the G-20 Summit. Reportedly, President Trump confiscated his interpreter's notes after the meeting and ordered the interpreter not to disclose to anyone what he had heard, including to administration officials. Peter Baker, Trump and Putin Have Met Five Times, What Was Said Is a Mystery, *New York Times*, Jan. 15, 2019, *available at* https://www.nytimes.com/2019/01/15/us/politics/trump-putin-meetings.html (last visited April 30, 2019); Greg Miller, Trump has concealed details of his face-to-face encounters with Putin from senior officials in administration, *Washington Post*, Jan. 13, 2019, *available at* https://www.washingtonpost.com/world/national-security/trump-has-concealed-details-of-his-face-to-face-encounters-with-putin-from-senior-officials-in-administration/2019/01/12/65f6686c-1434-11e9-b6ad-9cfd62dbb0a8_

story.html (last visited April 30, 2019). The interpreter for that summit, as with every meeting President Trump has with foreign leaders, was an employee or contractor of the State Department's Office of Language Services. *See* 6 FAM [Foreign Affairs Manual] 1530, Assignment of Interpreters to Official Visits and High-Level Meetings.

43.     State Department translators and interpreters "serve as the ears, voice and words in foreign languages of the President, the First Lady, the Vice President, the Secretary of State, the National Security Advisor, and other Cabinet officials." U.S. Department of State, Diplomacy in Action, Office of Language Services General Information, *available at* https://www.state.gov/m/a/ols/index.htm (last visited April 30, 2019). They are part of "a tradition of language support for the conduct of foreign policy that dates back to 1789[.]" *Id.* In past administrations interpreters not only provided interpretation services in meetings between presidents and foreign heads of state or foreign ministers, but also prepared written memoranda memorializing what was said. For example, a Memorandum of Conversation describing what was discussed at a meeting between the President and the German chancellor on June 4, 1965 regarding Vietnam, available at https://history.state.gov/historicaldocuments/frus1964-68v02/d331 (last visited April 30, 2019), was drafted by the interpreter.

44.     Although then-Secretary of State Rex Tillerson also was at the G-20 Summit and provided some limited details publicly about the meeting, his account reportedly "is at odds with the only detail that other administration officials were able to get from the interpreter," specifically that when Putin denied "any Russian involvement in the U.S. Election . . . Trump responded by saying 'I believe you.'" Miller, *Washington Post*, Jan. 13, 2019.

45.     During a dinner that followed, President Trump had a conversation with President Putin without any accompanying American witnesses. Peter Baker, <u>Trump and Putin Have Met Five Times. What Was Said Is a Mystery</u>, *New York Times*, Jan. 15, 2019, available at https://www.nytimes.com/2019/01/15/us/politics/trump-putin-meetings.html. U.S. officials did not learn of these actions until a senior State Department official and a White House advisor "sought information from the interpreter beyond a readout shared by Tillerson." Miller,

*Washington Post*, Jan. 13, 2019. The White House did not disclose the private discussion until after word had leaked out from other sources. Julie Hirschfeld Davis, Trump and Putin Held a Second, Undisclosed, Private Conversation, *New York Times*, Jul. 18, 2017, *available at* https://www.nytimes.com/2017/07/18/world/europe/trump-putin-undisclosed-meeting.html (last visited April 30, 2019).

46.     Following these meetings President Trump tweeted that in his meeting with President Putin he "strongly pressed President Putin twice about Russian meddling in our election. He vehemently denied it." Donald J. Trump @realDonaldTrump, July 9, 2017, *available at* https://twitter.com/realdonaldtrump/status/884012097805406208 (last visited April 30, 2019). President Trump also denied that sanctions had been discussed during the meeting. Donald J. Trump @realDonaldTrump, July 9, 2017, available at https://twitter.com/realdonaldtrump/status/884027201804488704 (last visited April 30, 2019).

47.     Russian officials, however, provided an "alternative account" claiming the President "had accepted Mr. Putin's denial of the election interference and had even said that some in the United States were 'exaggerating' Moscow's role without proof." Julie Hirschfeld Davis, David E. Sanger and Glenn Thrush, Trump Questions Putin on Election Meddling at Eagerly Awaited Encounter, *New York Times*, July 7, 2017, *available at* https://www.nytimes.com/2017/07/07/world/europe/trump-putin-g20.html (last visited April 30, 2019). The absence of any transcripts or notes from the meeting makes it impossible to verify the veracity of either the President's claims or the characterizations of the meeting provided by Russian officials.

48.     Presidents Trump and Putin also chatted informally a number of times during the November 2017 Asia-Pacific Economic Cooperation Summit in Da Nang, Vietnam. Dan Merica, Trump, Putin shake hands, chat multiple times at Asia-Pacific summit, *CNN*, Nov. 11, 2017,

*available at* https://www.cnn.com/2017/11/09/politics/donald-trump-vladimir-putin-vietnam/index.html (last visited April 30, 2019). While White House Press Secretary Sarah Sanders told reporters that the two would not have a formal meeting during the summit, President Putin's spokesperson said, "[t]he meeting will take place on the sidelines." *Id.* Despite the "diplomatic dust-up" from their previous meeting at the G-20 Summit in Germany over whether President Trump had in fact accepted President Putin's denials of any Russian meddling in the 2016 presidential election, *id.*, reportedly no official transcript or notes of their "sidelines" meetings in Vietnam exist. Baker, *New York Times*, Jan. 15, 2019.

49.     On July 16, 2018, President Trump held a much-heralded summit with President Putin in Helsinki, Finland. During their two-hour private meeting the two were accompanied only by interpreters. Adam Taylor, <u>Trump met Putin in Helsinki. More than 200 days later, will we ever find out what they said?</u>, *Washington Post*, March 5, 2019, *available at* https://www.washingtonpost.com/world/2019/03/05/trump-met-putin-helsinki-more-than-days-later-will-we-ever-find-out-what-they-said/ (last visited April 30, 2019). Following their tête-à-tête, Presidents Trump and Putin held a press conference during which President Trump, ignoring the findings of U.S. intelligence agencies, reported that President Putin had provided him with an "extremely strong and powerful" denial of Russian interference in the 2016 election. Taylor, *Washington Post*, Mar. 5, 2019.

50.     When subsequently questioned about what the two discussed in Helsinki, Director of National Intelligence Dan Coats stated, "I'm not in a position to either understand fully or talk about what happened in Helsinki." Aaron Blake, <u>Dan Coats's subtle-yet-stunning admission about Trump's meeting with Putin</u>, *Washington Post*, Aug. 2, 2018, *available at* https://www.

washingtonpost.com/news/the-fix/wp/2018/08/02/trumps-meeting-with-putin-is-apparently-being-kept-secret-even-from-u-s-intelligence/ (last visited April 30, 2019).

51.     White House National Security Advisor John Bolton claimed President Trump had told President Putin at the Helsinki summit that "U.S. troops would stay in Syria until Moscow forced out its Iranian allies[.]" Taylor, *Washington Post*, Mar. 5, 2019. But with no transcript from the summit or observers to the meeting, there is no way to verify the accuracy of Bolton's claims. Reportedly President Trump's interpreter left the meeting "with pages of notes," Miller, *Washington Post*, Jan. 13, 2019, but there is no indication those notes have been shared with anyone.

52.     President Trump's fifth meeting with President Putin took place in Buenos Aires, Argentina in November 2018 during another G-20 Summit. Like his second meeting with President Putin in Germany, President Trump conducted the conversation without anyone else from the U.S. present beyond his wife—no translator, no note-taker, and no official member of his delegation. James Politi, Demetri Sevastopulo and Henry Foy, Trump sat down with Putin at G20 without US note-taker, *Financial Times*, Jan. 29, 2019, *available at* https://www.ft.com/content/61842ec4-23a0-11e9-8ce6-5db4543da632; Alex Ward, Trump met Putin without staff or note takers present – again, *Vox*, Jan. 29, 2019, *available at* https://www.vox.com/2019/1/29/18202515/trump-putin-russia-g20-ft-note (last visited April 30, 2019). Instead, President Putin had his own translator present. *Id.* As a result, no U.S. transcript or other record of the meeting exists. According to "people familiar with the conversation . . . it appeared longer and more substantive than the White House has acknowledged." Politi, Sevastopulo and Foy, *Financial Times*, Jan. 29, 2019.

53.     Beyond the optics of President Trump meeting repeatedly in private with President Putin, the absence of any detailed written record of President Trump's five publicly reported meetings with President Putin have shielded those conversations from the public and prevented even top U.S. officials from knowing fully what President Trump said to and promised President Putin, who heads a country that is one of the United States' main foes. A former Russia adviser to President Bill Clinton expressed how "disconcerting" it is "to hide information from your own team," and "[v]eterans of past administrations" explained that "[w]hen they meet with foreign leaders, presidents typically want at least one aide in the room—not just an interpreter — to avoid misunderstandings later." Baker, *New York Times*, Jan. 15, 2019. Former Deputy Secretary of State Strobe Talbott said that proceeding in secrecy like President Trump has done "handicaps the U.S. government—the experts and advisers and Cabinet officers who are there to serve [the president]—and it certainly gives Putin much more scope to manipulate Trump." Miller, *Washington Post*, Jan. 13, 2019. President Trump's apparent categorical exemption of meetings with President Putin from the scope of the PRA violates his non-discretionary obligations to "assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and . . . preserved and maintained . . . ." 44 U.S.C. § 2203(a).

54.     In the absence of records of President Trump's conversations with President Putin U.S. officials reportedly have had to rely instead on "U.S. intelligence agencies tracking the reaction in the Kremlin." Miller, *Washington Post*, Jan. 13, 2019.

55.     According to President Putin's public statements, in addition to these one-on-one meetings, Presidents Putin and President Trump talk "regularly" by phone. Tucker Higgins, Russian leader Vladimir Putin: President Trump and I 'regularly talk over the phone', *CNBC*,

June 5, 2018, *available at* https://www.cnbc.com/2018/06/05/putin-says-he-talks-to-trump-regularly.html (last visited April 30, 2019). Presidential aides reportedly have been allowed to listen in on only some of these conversations, and often Russia has been the "first to disclose those calls when they occur and release statements characterizing them in broad terms favorable to the Kremlin." Miller, *Washington Post*, Jan. 13, 2019.

56.     One of the more noteworthy phone conversations between Presidents Putin and Trump occurred after President Putin was re-elected in an election that was widely perceived as corrupt and fundamentally anti-democratic. Despite the notation in President Trump's briefing papers "DO NOT CONGRATULATE," President Trump in fact congratulated the newly re-elected President Putin. Carol D. Leonnig, David Nakamura and Josh Dawsey, Trump's national security advisers warned him not to congratulate Putin. He did it anyway, *Washington Post*, Mar. 20, 2018, *available at* https://www.washingtonpost.com/politics/trumps-national-security-advisers-warned-him-not-to-congratulate-putin-he-did-it-anyway/2018/03/20/22738ebc-2c68-11e8-8ad6-fbc50284fce8_story.html.

57.     More recently, President Trump met with North Korean leader Kim Jong-Un in Hanoi, Vietnam, at a critical second nuclear summit. In a highly unusual move, the only other individuals present for their meeting were interpreters, who were not there to create a record of the conversation, with note takers again banned from the meeting, leaving U.S. policymakers in the dark about what transpired and leaving no historical record. Deb Riechmann and Foster Klug, Trump-Kim go one-on-one: Who will know what was really said?, *Associated Press*, Feb. 27, 2019, *available at* https://www.apnews.com/9ae27ac4e4254958adcd5350881f983e (last visited on April 30, 2019). Experts on North Korea have expressed concerns that these private

conversations provide the North Korean leader with "an opportunity to win concessions from Trump that working-level officials would have advised him not to offer." *Id.*

58.     Congress for its part expressed concerns that these practices violate the PRA in a letter from the Chairs of the House Committee on Oversight and Reform, the House Committee on Foreign Affairs, and the House Permanent Select Committee on Intelligence to White House Acting Chief of Staff Mick Mulvaney dated February 21, 2019. The letter notes that it appears President Trump has violated the PRA, based on: press reports of President Trump confiscating the notes of his interpreter from the Hamburg, Germany summit; earlier reports that President Trump physically tore up his records, leaving to staff the task of taping them back together; the inability of U.S. officials to obtain information about the President's Helsinki meeting with President Putin; and reports that President Trump may not be documenting the calls and meetings that do not appear on his schedule. To date, the White House has not responded to this letter.

59.     On March 4, 2019, these same Chairs on behalf of their committees wrote a letter to Secretary of State Michael Pompeo concerning communications between Presidents Trump and Putin. The letter noted the multiple press reports of President Trump taking steps to conceal the details of his conversations with President Putin and expressed the concern that, if true, they would "raise profound national security, counterintelligence, and foreign policy concerns, especially in light of Russia's ongoing active measures campaign to improperly influence American elections." The letter went on to note that, if true, President Trump's actions "undermine the proper functioning of government, most notably the [State] Department's access to critical information germane to its diplomatic mission and its ability to develop and execute foreign policy that advances our national interests." The Chairs, on behalf of their committees,

further expressed their "serious concerns that materials pertaining to specific communications may have been manipulated or withheld from the official record in direct contravention of federal laws, which expressly require that Presidents and other administration officials preserve such materials."

60.     Recent reporting reveals that these recordkeeping failures extend to other top White House officials. Senior White House Advisor Jared Kushner, whom the President has charged with bringing peace to the Middle East, recently met in Saudi Arabia with Saudi Crown Prince Mohammed bin Salman and King Salman. According to a White House statement, the three discussed "the peace efforts, as well as American-Saudi cooperation and plans to improve conditions in the region through investment." Ben Hubbard, Kushner Met With Saudi Crown Prince to Push Mideast Peace Plan, *New York Times*, Feb. 27, 2019, *available at* https://www.nytimes.com/2019/02/27/world/middleeast/kushner-Mohammed-bin-Salman.html (last visited April 30, 2019). Reportedly U.S. embassy staff in Riyadh "were not read in on the details of Jared Kushner's trip . . . or the meetings he held with members of the country's Royal Court[.]" Erin Banco, Embassy Staffers Say Jared Kushner Shut Them Out of Saudi Meetings, *Daily Beast*, March 7, 2019, *available at* https://www.thedailybeast.com/embassy-staffers-say-jared-kushner-shut-them-out-of-saudi-meetings (last visited April 30, 2019). The only State Department official who was allowed to attend the meeting is someone who focuses on Iran. *Id.* As a result, the U.S. embassy "was largely left in the dark on the details of Kushner's schedule and his conversations with Saudi officials[.]" *Id.*

61.     Rep. Eliot L. Engel, Chair of the House Committee on Foreign Affairs, expressed his concern with the sidelining of Embassy personnel during the planning and conducting of Kushner's Middle East meetings in a March 28, 2019 letter to Secretary of State Pompeo. As

Chairman Engel explained, "U.S. government resources are expended to support embassies in countries around the world to aid in the planning and execution of U.S. foreign policy, and an official visit to the Middle East by a senior White House aide would presumably bear meaningfully on the conduct of U.S. foreign policy in that region." *See* https://www.docu mentcloud.org/documents/5782881-Eliot-Engel-Letter.html (last visited April 30, 2019).

62.     This policy and practice by President Trump and other top White House officials like Jared Kushner of failing and/or refusing to create or preventing others from creating records of their meetings with foreign leaders, including at least Putin, Kim Jong-Un, and Saudi officials, deviates sharply from the protocols and practices of prior administrations. Victoria J. Nuland, a career State Department diplomat, explained: "All five of the presidents whom I worked for, Republicans and Democrats, wanted a word-for-word set of notes, if only to protect the integrity of the American side of the conversation against later manipulation by the Soviets or the Russians[.]" Baker, *New York Times*, Jan. 15, 2019. Public reporting confirms the views of former U.S. officials that the President's recordkeeping practices differ radically from those of previous presidents, "who have relied on senior aides to witness meetings and take comprehensive notes then shared with other officials and departments." Miller, *Washington Post*, Jan. 13, 2019.

63.     Consistent with this reporting, on information and belief, in previous administrations when presidents and other top White House officials met with foreign leaders in another country or in the United States, designated officials had the responsibility of preparing a record of the meeting. Depending on the administration's procedures, State Department officials, including at times State Department interpreters, sometimes drafted Memoranda of Conversation or "Memcoms." The record of the meeting would then be shared with officials who had a need to

know at the White House, the State Department, and other agencies. The memcon would become part of the official record at the White House and the agencies.

64.     On information and belief, in previous administrations when presidents had "one-on-one" conversations with foreign leaders, those interactions were almost without exception three-on-three. Each principal would be joined by two others: a translator and a note-taker. In some cases, the notetaker was a State Department employee. In other cases, the notetaker was a National Security Council employee. Although Plaintiffs are aware of instances in which translation and notetaking responsibilities were fulfilled by a single individual, that practice predates 1970.

65.     On information and belief, in previous administrations when presidents in fact had an actual one-on-one conversation with a foreign leader, the protocol called for a member or members of the president's delegation to be debriefed on what was said in that conversation, which would then be written up and either included in an official record of the meeting or sent out in a new email. In both instances, the description of the one-on-one meeting between a President and foreign leader would be part of the official State Department record.

66.     On information and belief, in addition to these federal agency records, EOP components, such as the National Security Council, often would generate documents memorializing what was said in meetings between the President and/or his top aides and foreign leaders regardless of where those meetings occurred. These records were treated as presidential records that were preserved as part of the record of that presidency.

67.     On information and belief, in previous administrations when presidents had telephone conversations with foreign leaders, a U.S. transcriber would be tasked with listening in on the calls and preparing a transcript. The transcript, which was designated as the Official Call

Transcript, was prepared in addition to any readout the White House prepared for public and other dissemination and was preserved as a presidential record.

68.     Beyond these recordkeeping failures, President Trump and his White House have ignored other obligations the PRA imposes. For example, notwithstanding his preservation obligations, President Trump had and may still have a habit of ripping up papers when he was done with them, which some described as "his unofficial 'filing system.'" Annie Karni, Meet the guys who tape Trump's papers back together, *Politico*, June 10, 2018, *available at* https://www. politico.com/story/2018/06/10/trump-papers-filing-system-635164 (last visited April 30, 2019).

69.     Further, Jared Kushner reportedly used an encrypted message service, WhatsApp, as well as a personal email account to conduct official business, including to communicate with Saudi Crown Prince Mohammed bin Salman. Andrew Desiderio and Kyle Cheney, Cummings demands docs on Kushner's alleged use of encrypted app for official business, *Politico*, Mar. 21, 2019, *available at* https://www.politico.com/story/2019/03/21/elijah-cummings-jared-kushner-encrypted-app-1230978 (last visited April 30, 2019). Similarly, White House Advisor Ivanka Trump also reportedly conducts official White House business through a personal email account, as did former Deputy National Security Adviser K.T. McFarland when communicating about the transfer of "'sensitive U.S. nuclear technology to Saudi Arabia,'" *id*, notwithstanding the statutory requirement that they use only their official electronic message accounts, except in certain specifically prescribed circumstances. 44 U.S.C. § 2209(a). These other recordkeeping violations also are the subject of ongoing congressional inquiries. *Id.*

70.     Moreover, use by White House staff and others associated with the Trump administration and the Trump campaign of encrypted communications stymied the investigation of Special Counsel Robert Mueller. In his recently released *Report on the Investigation Into*

*Russian Interference In the 2016 Presidential Election*, Mr. Mueller noted in his executive

summary, "the Office learned that some of the individuals we interviewed or whose conduct we

investigated—including some associated with the Trump Campaign—deleted relevant

communications or communicated during the relevant period using applications that feature

encryption or that do not provide for long-term retention of data or communications records."

*Id.*, Executive Summary to Volume I at 10.

71.    The recently released report by Special Counsel Mueller also revealed President

Trump's general antipathy toward note-taking. In a meeting with then-White House Counsel

Don McGahn the President chastised him for taking notes, proclaiming "Lawyers don't take

notes. I never had a lawyer who took notes[.]" *Id.* Vol. II, p. 117.

## PLAINTIFFS' CLAIMS FOR RELIEF

## CLAIM ONE

**(For Mandamus Relief Compelling President Trump, His Staff, and the EOP to Comply
with Their Non-Discretionary Duties Under the Presidential Records Act)**

72.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

73.    Mandamus relief is appropriate where a plaintiff has a clear right to relief but no

other adequate remedy, and the defendant has a clear duty to act. *See, e.g.*, *United States ex rel.*

*McLennan v. Wilbur*, 283 U.S. 414, 420 (1931); *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C.

Cir. 1996). No separate waiver of sovereign immunity is required to seek a writ of mandamus to

compel an official to perform a duty required in his official capacity." *Fornaro v. James*, 416

F.3d 63, 69 (D.C. Cir. 2005).

74.    The PRA imposes on the President, his staff, and the EOP several non-

discretionary mandatory obligations. These include the requirements that:

a.      the President, through the implementation of records management controls and other necessary actions, "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records . . .", 44 U.S.C. § 2203(a);

b.      "Documentary materials produced or received by the President, the President's staff, or units or individuals in the Executive Office of the President the function of which is to advise or assist the President, shall, to the extent practicable, be categorized as Presidential records or personal records upon their creation or receipt and be filed separately", 44 U.S.C. § 2203(b);

c.      the President maintain recordkeeping polices, guidelines, and practices that, consistent with the PRA and FRA, accurately classify records as presidential records and do not improperly treat agency records as presidential records, in violation of the PRA and FRA. *See Armstrong v. Exec. Office of the President, Office of Admin.*, 1 F.3d 1274, 1294 (D.C. Cir. 1993) ("[T]he courts may review guidelines outlining what is, and what is not, a 'presidential record' to ensure that materials that are not subject to the PRA are not treated as presidential records."); and

d.      the President "obtain[] the views, in writing, of the Archivist concerning the proposed disposal of such Presidential records" and produces a disposal schedule to the appropriate congressional committee before disposing of presidential records during his term of office, 44 U.S.C. § 2203(c).

75.     The PRA leaves the President no discretion whether to comply with these requirements. The President cannot remove from the mandatory requirement to create and preserve records an entire class of communications the President and his top advisors have with foreign leaders either in person or by telephone. Such records must be created, must "be categorized as Presidential records or personal records upon their creation or receipt and be filed separately," 44 U.S.C. § 2203(b), and the President must issue classification policies, guidelines, and practices that are consistent with the statutory definitions of presidential records in the PRA and agency records in the FRA. Finally, the President also has no discretion as to whether to seek the views of the Archivists or to transmit a disposal schedule to Congress before disposing of presidential records.  *See* 44 U.S.C. § 2203(c).

76.     As detailed above, President Trump personally as well as by and through his staff has violated each of these mandatory, non-discretionary obligations by engaging in a policy and practice of refusing to create records of his meetings and conversations with foreign leaders; by seizing interpreter's notes, which are agency records, and effectively classifying them as presidential records; by asserting unilateral and exclusive control over the contents of meetings by the President and his staff with foreign leaders; by maintaining recordkeeping polices, guidelines, and practices that improperly classify agency records as presidential records; and by destroying or ordering the disposal of presidential records without obtaining the Archivist's views in writing or producing a disposal schedule to Congress as the PRA requires.

77.     Review of these violations is essential to "prevent[] the PRA from becoming a potential presidential *carte blanche* to shield materials from the reach of the FOIA." *Armstrong*, 1 F.3d at 1292.

78.     Plaintiffs therefore are entitled to mandamus relief ordering the President, his

staff, and the EOP to comply with their mandatory, non-discretionary duties under the PRA.

## CLAIM TWO

**(For a Declaratory Judgment that Defendants' Policy and Practice of Failing or Refusing to Create Records of the President's and His Staff's Meetings and Conversations with Foreign Leaders Violates the Presidential Records Act)**

79.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

80.     The PRA imposes on the president, his staff, and the EOP the non-discretionary

mandatory obligation to create records documenting "the activities, deliberations, decisions, and

policies that reflect the performance of the President's constitutional, statutory, or other official

or ceremonial duties[.]" 44 U.S.C. § 2203(a).

81.     Despite this clear and unambiguous command, President Trump and his staff have

a policy and practice of repeatedly failing and/or affirmatively refusing to create records of their

meetings and conversations with foreign leaders in violation of their mandatory, non-

discretionary legal obligations to create records documenting their actions, deliberations,

decisions, and policies that reflect on the President's performance of his duties. 44 U.S.C.

§ 2203(a). This policy and practice amounts to a categorical exemption of such meetings and

conversations from the scope of the PRA.

82.     President Trump also has impermissibly removed from the scope of the PRA

certain categories of communications, specifically certain foreign policy activities, deliberations,

decisions, and policies that reflect the performance of the president's constitutional, statutory, or

other official or ceremonial duties.

83.     The unlawful actions of President Trump, his staff, and the EOP have deprived

Plaintiffs of future access through the FOIA to documents they are entitled to receive by law that

would shed light on the President's actions, deliberations, decisions, and policies, all information

Plaintiffs need to perform their core missions.

84.     Plaintiffs are therefore entitled to a declaratory judgement that President Trump,

his staff, and the EOP have violated their non-discretionary statutory duties under the PRA, 44

U.S.C. §§ 2201–2209.

## CLAIM THREE

**(For a Declaratory Judgment that the President's Classification of Interpreter Notes as
Presidential Records and His Assertion of Unilateral and Exclusive Control Over the
Contents of Meetings by the President and His Staff With Foreign Leaders Violate the
Presidential Records Act and the Federal Records Act)**

85.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

86.     The classification by the President (or his staff and the EOP) of records created by

employees of the Department of State as presidential records contravenes both the PRA and

FRA.

87.     Similarly, the President's assertion of unilateral and exclusive control over the

contents of meetings he and his staff have with foreign leaders also contravenes the PRA and

FRA.

88.     As laid out in detail in the preceding paragraphs, Congress established different

maintenance and disclosure regimes for agency records and presidential records, but both

statutes impose affirmative, non-discretionary obligations to create records in the first instance.

*See* 44 U.S.C. § 3101; 44 U.S.C. § 2203(a). Agency records are governed by the FRA and

available for public access through the FOIA as soon as they are created. *See* 5 U.S.C. § 552 (a),

(f). Presidential records, by contrast, are governed by the PRA and publicly available through the

FOIA only after a President has left office. *See* 5 U.S.C. § 2204. Congress also established

different regimes for disposing of agency records and presidential records.  *See* 44 U.S.C. §

3106; 44 U.S.C. § 2203(c)-(e). All of these distinctions rest on a fundamental assumption—that records are created in the first instance and properly classified as agency or presidential records upon their creation.

89.     On information and belief, the individual or individuals who have provided interpretation or translation services to the President in bilateral meetings with foreign heads of state are employees of the Department of State.

90.     On information and belief, State Department officials and other federal agency personnel are charged with creating and transmitting records of the meetings and conversations the President and his staff have with foreign heads of state.

91.     Accordingly, the records that those State Department employees create while providing interpretation or translation services to President Trump and those records they create memorializing the President's meetings and conversations are agency records for the purposes of the FRA, are subject to the management and disposal requirements of the FRA, and can be publicly accessed through the FOIA immediately upon their creation, subject to any applicable FOIA exemption. *See* 44 U.S.C. § 3101, *et. seq.*; 5 U.S.C. § 552.

92.     The President's classification of these agency records as presidential records and his assertion of unilateral and exclusive control over all information that flows from these meetings upset the entire federal recordkeeping regime that Congress established. The effect of this classification is to deny Plaintiffs and other members of the public the opportunity to access agency records upon their creation. It also denies agencies access to and control of information needed to conduct agency business and comply with their obligations under the FRA.

93.     Plaintiffs are therefore entitled to a declaratory judgment that the Defendants' directives that the Department of State not create or maintain records of the president's bilateral

meetings with certain foreign heads of state and the President's assertion of unilateral and

exclusive control over the contents of meetings he and his staff have with foreign leaders violate

the PRA and the FRA.

## CLAIM FOUR

**(For a Declaratory Judgment that the President's Failure to Obtain the Archivist's Written Views and to Transmit a Disposal Schedule to Congress Prior to Disposing of Presidential Records Violates the Presidential Records Act)**

94.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

95.     The President, his staff, and the EOP must engage in a basic, nondiscretionary

process before disposing of presidential records. They must obtain the views of the Archivist in

writing and transmit a disposal schedule to Congress prior to disposing of a presidential record.

*See* 44 U.S.C. § 2203(c), (d).

96.     President Trump has asserted or established a policy, practice, or guideline of

treating records created by individuals providing translation or interpretation services to him and

the contents of his and his staff's meetings with foreign heads of state as exclusively presidential

records. *See id.*

97.     President Trump has disposed of presidential records without first obtaining the

views of the Archivist in writing and transmitting a disposal schedule to Congress prior to

disposing of the record.

98.     Plaintiffs are therefore entitled to a declaratory judgment that by failing to obtain

the views of the Archivist in writing and transmitting a disposal schedule to Congress prior to

disposing of a presidential record, Defendants are violating the PRA.

## CLAIM FIVE

**(For a Declaratory Judgement that President Trump's Noncompliance with the Presidential Records Act and Federal Records Act Is a Violation of his Constitutional Obligation to Take Care to Faithfully Execute the Law and Injunctive Relief to Ensure His Future Compliance with These Obligations)**

99.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

100.     The failure of President Trump, his staff, and the EOP to create and maintain records documenting "the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties," 44 U.S.C. § 2203(a), contravenes Congress' core purposes in enacting the PRA: "the preservation of the historical record of the future Presidencies" and "public access to the materials" of a presidency. H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. § 2 (1978).

101.     The interference by the President with the duty of the Department of State to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities," 44 U.S.C. § 3101, contravenes one of Congress's core purposes in enacting the FRA: to ensure that agencies to which it has delegated power and appropriated resources create a record of their essential business. Failure to create these records stymies congressional and public oversight and impedes agencies like the Department of State from carrying out their essential missions. It also excludes such records from the reach of the FOIA for up to twelve years. 44 U.S.C. § 2204(a).

102.     By and through his actions, President Trump has violated an obligation that the Constitution places solely on the President—to take care that the laws be faithfully executed—by directing or causing violations of the PRA and FRA.

103.    The President's violations of the Take Care Clause have harmed Plaintiffs and other members of the public by delaying or denying access to agency records that should be accessible through the FOIA.

104.    The President's violations of the Take Care Clause have harmed Plaintiffs and other members of the public by denying them eventual access to presidential records through the FOIA once President Trump leaves office.

105.    Plaintiffs are therefore entitled to a declaratory judgment that the President's failure and/or outright refusal to comply with his mandatory, non-discretionary obligations under the PRA to create and preserve records and his interference with the State Department's compliance with its non-discretionary obligations under the FRA are contrary to law and violate the President's constitutional obligation to take care that the law be faithfully executed.  *See* 44 U.S.C. § 2203(a); 44 U.S.C. § 3101.

106.    Plaintiffs are also entitled to injunctive relief ensuring President Trump's future compliance with his obligation to take care that the record-creating, classification, and procedural obligations imposed by the PRA on the President and FRA on executive branch agencies are faithfully executed.  *See id.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that Defendants' policy and practice of failing to create and preserve records documenting the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties violates the PRA.

37

2.      Declare that the President's policy and practice of destroying records of his meetings with foreign leaders without following mandatory, non-discretionary notification requirements violates the PRA.

3.      Declare that the President's policy and practice of exercising control over records of and information about his meetings with foreign leaders that were created by agency officials violates the PRA and the FRA.

4.      Order all defendants in the form of injunctive and mandamus relief to maintain a policy and practice of creating and preserving records documenting the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties.

5.      Declare that Defendants' policy and practice of failing and/or outright refusal to comply with their mandatory, non-discretionary obligations under the PRA to create and preserve records is contrary to law and violates the President's constitutional obligation to take care that the law be faithfully executed.

6.      Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON

_____
Anne L. Weismann, D.C. Bar No. 298190
Conor M. Shaw, D.C. Bar No. 1032074
1101 K Street, N.W.,
Washington, D.C. 20005
Phone: (202) 408-5565
Email: aweismann@citizensforethics.org
Email: cshaw@citizensforethics.org

BAKER & McKENZIE LLP

George M. Clarke III, D.C. Bar No. 480073
Mireille R. Oldak, D.C. Bar No. 1027998
Steven Chasin, D.C. Bar No. 495853
815 Connecticut Avenue, N.W.
Washington, D.C. 20006
Phone: (202) 835-6184
Fax: (202) 416-7184
Email: george.clarke@bakermckenzie.com
Email: mireille.oldak@bakermckenzie.com
Email: steven.chasin@bakermckenzie.com

**Dated:** May 7, 2019