**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON *et al.*, <br><br>        Plaintiffs, <br><br>        v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br>        Defendants. | No. 19-cv-1333 ABJ |

<u>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 3

    I.     Legal Framework Governing Executive Branch Records ......................... 3

        A.     The Federal Records Act ................................................. 5

        B.     The Presidential Records Act ......................................... 6

    II.     Procedural History ................................................................. 8

STANDARD OF REVIEW ............................................................................... 9

ARGUMENT .................................................................................................. 11

    I.     THE PRESIDENTIAL RECORD ACT'S BAR ON JUDICIAL REVIEW REQUIRES DISMISSAL OF THIS CASE IN ITS ENTIRETY ............. 11

        A.     Judicial Review of Defendants' Compliance with the PRA Is Precluded Under the D.C. Circuit's Decision in *Armstrong I* ...... 11

        B.     The Exception in *Armstrong II* Does Not Apply Here ................. 15

    II.     PLAINTIFFS FAIL TO ESTABLISH THE ELEMENTS NECESSARY FOR MANDAMUS JURISDICTION (CLAIM ONE) ............................ 19

        A.     Plaintiffs Cannot Establish a Clear Right to Relief ..................... 20

        B.     Plaintiffs Cannot Establish a Clear Duty to Act .......................... 23

        C.     No Writ of Mandamus Can Lie Against the President ................. 25

    III.     IN THE ABSENCE OF MANDAMUS JURISDICTION, PLAINTIFFS' CLAIMS SEEKING DECLARATORY RELIEF CANNOT PROCEED (CLAIMS TWO, THREE, AND FOUR) ................................................ 26

    IV.     PLAINTIFFS ARE NOT ENTITLED TO RELIEF UNDER THE TAKE CARE CLAUSE FOR ALLEGED STATUTORY VIOLATIONS (CLAIM FIVE) ............................................................................. 27

CONCLUSION .............................................................................................. 29

# **TABLE OF AUTHORITIES**

## **Cases**

*13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758 (D.C. Cir. 1980) .....................24

*Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011) ...............................................26

*Am. Fed'n of Gov't Employees, AFL-CIO v. Trump*,
    318 F. Supp. 3d 370 (D.D.C. 2018) .......................................................27

*Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183 (D.C. Cir. 2016) .....................................20, 24

*\*Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991) ..................... *passim*

*\*Armstrong v. Exec. Office of the President* ("*Armstrong II*"),
    1 F.3d 1274 (D.C. Cir. 1993) ......................................................... *passim*

*Armstrong v. EOP*, 810 F. Supp. 335 (D.D.C. 1993) .......................................................16

*Armstrong v. EOP* ("*Armstrong III*"), 90 F.3d 553, 557 (D.C. Cir. 1996) .............6, 16, 27

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ...............................................10

*Arroyo v. City of Buffalo*, No. 15-cv-753A, 2017 WL 3085835
    (W.D.N.Y. July 20, 2017), *report & recommendation adopted*,
    2018 WL 488943 (W.D.N.Y. Jan. 20, 2018).........................................................22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................10, 18, 19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................10, 11, 19

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) .......................................................10

*CREW v. Trump*, 302 F. Supp. 3d 127, 137 (D.D.C. 2018),
    *aff'd* 924 F.3d 602 (D.C. Cir. 2019) ...........................................................7, 28, 29

*\*CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019) ................................................. *passim*

*CREW v. U.S. Dep't of Homeland Security*,
    527 F. Supp. 2d 101, 110 (D.D.C. 2007) ...........................................................27

*CREW v. U.S. Dep't of Homeland Security*,
    No. 18-2473, -- F. Supp. 3d --, 2019 WL 2248527 (D.D.C. May 24, 2019) ........15

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ..................................23, 24

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ....................................................10

*Dalton* v. *Specter*, 511 U.S. 462 (1994) ..........................................................................28

*Democracy Forward Found. v. U.S. Gen. Servs. Admin.*,
    No. 18-cv-1037, 2019 WL 2775621 (D.D.C. July 2, 2019) .................................6

*Democracy Forward Found. v. White House Office of Am. Innovation*,
    356 F. Supp. 3d 61, 66 (D.D.C. 2019) ....................................................................4

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997) .................11

*Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*,
    369 F. Supp. 3d 27 (D.D.C. 2019) .......................................................................27

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) .......................................................25, 26

*In re Cheney*, 406 F.3d 723 (D.C. Cir. 2005) (en banc) .................................................20

*In re U.S. Office of Personnel Mgmt. Data Security Breach Litig.*,
    928 F.3d 42 (D.C. Cir. 2019) ...............................................................................19

*Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007) .........................10

*Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*,
    845 F. Supp. 2d 288 (D.D.C. 2012) ...............................................................15, 20

*Judicial Watch Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013) ........................19

*Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136 (1980) ...........4, 6

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) ....................................9

*Lovitky v. Trump*, No. 19-cv-1454, 2019 WL 3068344 (D.D.C. July 12, 2019) .............26

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................28

*Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475 (1867) ...............................................25, 28

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ...............................................................6

*\*Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010) ....................................................25

*PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75 (D.C. Cir. 2018) ....................23

*Prison Legal News v. Samuels*, 787 F.3d 1142 (D.C. Cir. 2015) .......................................6

*Skelly Oil Co. v. Phillips Petroleum Co*., 339 U.S. 667 (1950) ........................................26

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996) ....................................................24, 25, 26

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) ...................................23

*United States v. Espy*, 145 F.3d 1369 (D.C. Cir. 1998) ...................................................27

*United States ex rel. McLennan v. Wilbur*, 283 U.S. 414 (1931) ....................................24

*Zivotofsky ex rel. Zivotofsy v. Kerry*, 135 S. Ct. 2076 (2015) .........................................23

**<u>Statutes</u>**

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 ......................4, 5, 6, 8, 16, 19, 27

Administrative Procedure Act ("APA"), 5 U.S.C. § 706 ...........................................15, 27

Declaratory Judgment Act, 28 U.S.C. § 2201 .................................................................26

Federal Records Act ("FRA"),
    44 U.S.C. §§ 2101–2120, 2901–2911, 3101–3107, 3301–3314 ................. *passim*

44 U.S.C. § 2112 ........................................................................................................8, 13

Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§ 2201–2209 .................... *passim*

44 U.S.C. § 2201 ................................................................................................................4

44 U.S.C. § 2202 ................................................................................................................7

44 U.S.C. § 2203 .................................................................................................7, 8, 14, 24

44 U.S.C. § 2204 ................................................................................................................8

44 U.S.C. § 2905 ................................................................................................................5

44 U.S.C. § 3101 ................................................................................................................5

44 U.S.C. § 3105 ................................................................................................................5

44 U.S.C. § 3106 ................................................................................................................5

44 U.S.C. § 3301 .........................................................................................................3, 19

## INTRODUCTION

This case is the latest episode in a series of failed but dogged efforts to conscript the courts into micromanaging the President's recordkeeping practices under the Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§ 2201–2209.  In this case, Plaintiffs ask the Court to issue mandamus and declaratory relief against the President because he has supposedly violated the PRA's recordkeeping obligations when meeting with foreign leaders. Plaintiffs' extraordinary demand flies in the face of repeated holdings by the D.C. Circuit precluding judicial review of the President's compliance with the PRA, not to mention the President's broad authority to negotiate with foreign leaders in the manner he deems appropriate. Nearly three decades ago, in *Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991), the D.C. Circuit made clear that the President has "virtually complete control" over his records while in office and that nothing in the PRA interferes with his discretion. *Id.* at 290. And when two of the three organizational plaintiffs here recently urged the court to hold otherwise, their attempt was squarely rejected. *See CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019). This longstanding bar on judicial review of the President's records creation, management, or disposal decisions, and of his day-to-day recordkeeping practices, requires dismissal of this latest effort by private parties to dictate how the President manages his records while in office.

Plaintiffs try to invoke a narrow exception to *Armstrong I*, set forth in the D.C. Circuit's later decision in *Armstrong v. Exec. Office of the President* ("*Armstrong II*")*,* 1 F.3d 1274, 1294 (D.C. Cir. 1993), by suggesting that the President improperly confiscated notes, made by a State Department interpreter during a meeting of the President with a foreign leader, and in doing so, converted a supposed State Department record, governed by the different recordkeeping regime set forth in the Federal Records Act ("FRA"), into a Presidential record governed by the PRA.

However, *Armstrong II* involved a challenge to the definition of records in a written guideline, not a dispute regarding the President's alleged decision to take possession of a document in one instance. *See id.* As even the *CREW* plaintiffs conceded, no exception to *Armstrong I* conceivably allows for judicial review of the President's day-to-day operations, so a claim based on this single act of alleged noncompliance by the President must fail.

In addition, Plaintiffs' assertion that the interpreter's notes qualify as a "federal record" covered by the FRA is mere speculation, particularly given the obvious alternative possibility—at least as plausible as Plaintiffs' suggestion—that such notes were never intended to be preserved, but instead consisted only of isolated words or phrases jotted down simply to aid the interpreter's short-term memory recall while engaged in the task of interpreting between two languages. Plaintiffs cannot plausibly claim that the President violated the PRA by allegedly, on a single occasion, taking possession of such notes. Indeed, the President would be well within his discretion in doing so.

Plaintiffs' other efforts to establish a PRA violation are strained and insubstantial. As the court recognized in *CREW*, the White House Counsel issued a memorandum in February 2017, instructing all White House personnel to follow certain recordkeeping practices. That memo sets forth the PRA's requirements in full, including the requirement to adequately document the President's activities. As the *CREW* court explained, "the Memo does just what the PRA requires." *CREW*, 924 F.3d at 607. As in *CREW*, Plaintiffs have not come close to establishing noncompliance with the PRA, especially where official White House policy is entirely consistent with the statute. Moreover, given the President's broad discretion in conducting foreign affairs, which includes the authority to negotiate with foreign leaders in the manner he deems most effective, Plaintiffs can point to no clear obligation on the part of the President or his staff to

document meetings and discussions with foreign leaders in the precise way that Plaintiffs demand. Because Plaintiffs thus fail to establish mandamus jurisdiction, which requires a clear right to relief and a clear duty to act, their claim seeking mandamus relief should be dismissed.

Plaintiffs' purportedly separate claims for declaratory relief cannot proceed independently, and must therefore be dismissed for the same reasons just explained. Plaintiffs' further attempt to repackage the alleged PRA violations as a constitutional claim under the Take Care Clause should also be rejected. Under that remarkable theory, any statutory claim against the government could proceed on constitutional grounds, swallowing entire fields of law regarding private rights of action and the preclusion of judicial review. In light of such ramifications, no court has ever allowed a private litigant to circumvent traditional limitations on statutory causes of action by invoking the Take Care Clause. This Court should not be the first.

## BACKGROUND

### I.     Legal Framework Governing Executive Branch Records

Executive branch records are governed by either the FRA, 44 U.S.C. §§ 2101–2120, 2901–2911, 3101–3107, 3301–3314, or the PRA. As the D.C. Circuit has explained, "[t]he FRA and the PRA apply to distinct categories of documentary materials." *Armstrong II*, 1 F.3d at 1290. Specifically, the FRA governs records that are "made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them." 44 U.S.C. § 3301(a)(1)(A).

The PRA, in turn, applies to Presidential records—in other words, materials that are "created or received by the President, the President's immediate staff, or a unit or individual of the

Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). The PRA expressly excludes from the definition of Presidential records any materials that qualify as "official records of an agency (as defined in [the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(f)[1])." 44 U.S.C. § 2201(2)(B).[2] It also excludes "personal records," which are materials "of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2)(B), (3). Personal records include, for example, "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business. *Id.* § 2201(3)(A).

The existence of two separate records regimes—one, under the FRA, governing agencies' federal records, and the other, under the PRA, governing Presidential records—is significant because the two regimes create very different systems of records management, reflecting Congress's concern to avoid encroaching upon the President's authority to manage his own records

---

[1] Although the PRA, 44 U.S.C. § 2201(2)(B) refers to subsection (e) of the FOIA, that subsection has been re-codified at 5 U.S.C. § 552(f).

[2] With respect to the Executive Office of the President ("EOP"), the Supreme Court has recognized that "the President's immediate personal staff" as well as "units in the Executive Office whose sole function is to advise and assist the President" are not included within FOIA's definition of "agency." *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980). For example, the White House Office and the National Security Council are not subject to the FRA. *E.g.*, *Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 66 (D.D.C. 2019). Accordingly, there is no overlap; an EOP component is governed either by the PRA or by the FRA, depending on whether that component is within the White House Office, which is categorically excluded from the definition of an agency, or, for components outside the White House Office, whether the component's sole function is to advise and assist the President.

during his term in office.

### A. The Federal Records Act

Under the FRA, "[t]he head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. § 3101. The statute further provides, among other things, that agency heads must "establish safeguards against the removal or loss of records the head of such agency determines to be necessary and required by regulations of the Archivist." *Id.* § 3105; *see generally Armstrong II*, 1 F.3d at 1278–79 (providing overview of FRA).

The FRA states that "[t]he head of each Federal agency shall notify the Archivist" if the agency head becomes aware of the unlawful removal or destruction of records, "and with the assistance of the Archivist shall initiate action through the Attorney General for the recovery of records the head of the Federal agency knows or has reason to believe have been unlawfully removed from that agency." 44 U.S.C. § 3106(a); *see also id.* § 2905 (requiring Archivist to notify the agency head of unlawful removal or destruction of records and to assist the agency head in initiating action through the Attorney General). If the agency head "does not initiate an action for such recovery or other redress within a reasonable period of time . . . , or is participating in, or believed to be participating in any such unlawful action, the Archivist shall request the Attorney General to initiate such an action, and shall notify Congress when such a request has been made." *Id.* § 3106(b).

Agencies' federal records governed by the FRA are also generally subject to FOIA, which

allows individuals to request the disclosure of agency records. *See* 5 U.S.C. § 552(a)(3).[3] Upon receipt of a request that "reasonably describes" the records being sought, *id.* § 552(a)(3)(A), an agency must typically "conduct[] a search reasonably calculated to uncover all relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (citation omitted). The agency is generally required to disclose any responsive records located in a reasonable search, except to the extent that such records are protected from disclosure by one of FOIA's statutory exemptions. *See* 5 U.S.C. § 552(b); *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 (D.C. Cir. 2015).

In the event that an agency withholds responsive records from the requester, the requester may, after exhausting administrative remedies, file a lawsuit in district court challenging the agency's withholdings. *See id.* § 552(a)(4)(B) (stating that the court may "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant").

### B.    The Presidential Records Act

In contrast to the system of administrative and judicial oversight set forth in the FRA, the PRA's statutory text vests broad authority in the President over recordkeeping during his term in office. The PRA directs the President to take "all such steps as may be necessary to assure that the

---

[3] Entities that qualify as "agencies" for purposes of the FRA are also "agencies" for purposes of FOIA. *See Armstrong v. EOP* ("*Armstrong III*"), 90 F.3d 553, 556 (D.C. Cir. 1996) ("[T]he coverage of the FRA is coextensive with the definition of 'agency' in the FOIA."). However, unlike the FRA, which contains a definition of "records," as described above, FOIA does not provide a definition of "agency records." *See Democracy Forward Found. v. U.S. Gen. Servs. Admin.*, No. 18-cv-1037, 2019 WL 2775621, at *4 (D.D.C. July 2, 2019) (explaining that, under Supreme Court and D.C. Circuit authority, a document qualifies as an "agency record" for FOIA purposes if it satisfies two requirements: "First, the agency must either create or obtained the requested materials. Second, the agency must be in control of the requested materials at the time the FOIA request is made." (internal quotation and citation omitted)); *see also generally Kissinger*, 445 U.S. 136. In the interest of precision, the term "federal records" herein refers to records that fall within the FRA's statutory definition of records, while "agency records" refers to records subject to the FOIA.

6

activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records pursuant to the requirements of this section and other provisions of law." 44 U.S.C. § 2203(a). The PRA also directs the President, "to the extent practicable," to "categorize[]" materials as Presidential records or personal records "upon their creation or receipt" and to "file[] [them] separately." *Id.* § 2203(b).

In light of this statutory language, the D.C. Circuit recognizes that "the PRA accords the President virtually complete control over his records during his term of office." *Armstrong I*, 924 F.2d at 290; *see CREW*, 924 F.3d at 603 ("Although the PRA makes clear that the United States, 'retain[s] complete ownership, possession, and control of Presidential records,' 44 U.S.C. § 2202, it also provides that the President, during his term in office, shall assume 'exclusive[] responsib[ility] for custody, control, and access to such Presidential records.'"). This control encompasses "creation" decisions, as well as "management, and disposal decisions." *Armstrong I*, 924 F.3d at 290. "Thus, the courts may not review any decisions regarding *whether to create* a documentary presidential record." *Armstrong II*, 1 F.3d at 1294 (explaining that "[a] 'creation' decision refers to the determination to *make* a record documenting presidential activities"). Nor may the courts impose limits on "which records to maintain or destroy." *CREW v. Trump*, 302 F. Supp. 3d 127, 137 (D.D.C. 2018), *aff'd* 924 F.3d 602 (D.C. Cir. 2019); *cf. Armstrong II*, 1 F.3d at 1294 (explaining that "[m]anagement decisions' describes the day-to-day process by which presidential records are maintained," and "'disposal decisions' describes the process outlined in 44 U.S.C. § 2203(c)–(e) for disposing of presidential records").

Indeed, unlike the FRA, the PRA contemplates a limited role for the Archivist during a President's time in office, including in connection with the potential destruction of records. During

the President's term in office, the President may dispose of records that he determines "no longer have administrative, historical, informational, or evidentiary value," provided that he first obtains the written views of the Archivist of the United States. *Id.* § 2203(c). However, although the Archivist may then "inform Congress of the President's desire to dispose of the records, neither the Archivist nor the Congress has the authority to veto the President's disposal decision." *Armstrong I*, 924 F.2d at 290.

In addition, as noted above, FOIA does not, by its own terms, apply to Presidential records while the President is in office. Once a President's time in office has concluded, the Archivist receives the Presidential records and deposits them in a Presidential archival depository, commonly referred to as a Presidential library. *See* 44 U.S.C. § 2203(g)(1)–(2). The library, under the direction of the Archivist, must then begin processing and organizing the records to provide for public access. *Id.* Pursuant to the PRA, Presidential records become subject to public request under FOIA five years following the President's final term in office, *see* 44 U.S.C. § 2204(b)(2), but the President may designate certain records as exempt from FOIA for a period of twelve years, *see id.* § 2204(a). Once a President leaves office and his Presidential records have been deposited, the Archivist assumes "responsibility for the custody, control, and preservation of, and access to, the Presidential records of the President." *Id.* § 2203(g); *see also id.* § 2112(c).

## II.    Procedural History

Plaintiffs filed the instant Complaint on May 7, 2019, generally challenging the President's recordkeeping practices. [ECF 1.] The Complaint asserts that the President and his staff have failed to create and preserve records of meetings and discussions with foreign leaders, and specifically challenges the President's alleged decision to classify the notes of a State Department interpreter as Presidential records. Plaintiffs' Complaint identifies five separate claims. Claim One seeks

mandamus relief to compel the President and other White House personnel to comply with the PRA. Compl. ¶¶ 74–78. Plaintiffs say that (1) the President engages in "a policy and practice of refusing to create records of his meetings and conversations with foreign leaders"; (2) the President has improperly asserted "unilateral and exclusive control over the contents of meetings by the President and his staff with foreign leaders," including through the President's alleged seizure of the notes of a State Department interpreter, and has maintained recordkeeping policies, guidelines, and practices that improperly classify federal records subject to the FRA as Presidential records; and (3) the President has destroyed or ordered the disposal of Presidential records without obtaining the Archivist's views in writing or producing a disposal schedule to Congress. *Id.* ¶ 76. Claims Two, Three, and Four seek declaratory judgments that the President has violated the PRA through, respectively, each of the three alleged policies or practices identified in Claim One, with Claim Three also seeking a declaratory judgment that the President has violated the FRA. *Id.* ¶¶ 80–82 (Claim Two), 86–92 (Claim Three), 95–97 (Claim Four). Claim Five seeks a declaratory judgment that the same alleged policies and practices that Plaintiffs seek to identify as violations of the PRA and FRA also violate the Constitution's Take Care Clause, and also seeks injunctive relief that would compel compliance with the PRA and FRA in the future. Compl. ¶¶ 100–106. These allegations all rely on a theory—that mandamus and declaratory relief are available to superintend the President's compliance with the PRA—that the courts have repeatedly rejected.

## STANDARD OF REVIEW

Defendants move for dismissal under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. In reviewing a motion to dismiss under Rule 12(b)(1), a court is guided by the principle that "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Thus, a federal court must presume that it "lack[s] jurisdiction

unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). The burden of demonstrating the contrary "'rests upon the party asserting jurisdiction.'" *Id.* When considering jurisdiction based on the face of a plaintiff's complaint, a court must accept "well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). However, the court need not "assume the truth of legal conclusions," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), nor "accept inferences that are unsupported by the facts set out in the complaint," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). Rather, in order to avoid dismissal, a complaint must contain sufficient factual matter "to state a claim [of standing] that is plausible on its face." *Iqbal*, 556 U.S. at 678. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Defendants also move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6), on the ground that Plaintiffs fail to state a claim upon which relief can be granted. A Rule 12(b)(6) challenge "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating such a claim, the plausibility requirement of *Iqbal* and *Twombly* applies to the merits of a plaintiff's claims. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Thus, in order to withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The plaintiff's allegations must be sufficiently detailed "to raise a right to relief above the

speculative level." *Twombly*, 550 U.S. at 555. The court may consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## ARGUMENT

### I. THE PRESIDENTIAL RECORDS ACT'S BAR ON JUDICIAL REVIEW REQUIRES DISMISSAL OF THIS CASE IN ITS ENTIRETY

#### A. Judicial Review of Defendants' Compliance with the PRA Is Precluded Under the D.C. Circuit's Decision in *Armstrong I*

A well-developed line of authority in this Circuit establishes that judicial review of claims alleging PRA violations is unavailable except in narrow circumstances that are not present here, and that such claims therefore should be dismissed. The D.C. Circuit held in *Armstrong I*, that the PRA "precludes judicial review of the President's recordkeeping practices and decisions." *Armstrong I*, 924 F.2d at 291. The *Armstrong* decision arose from a lawsuit, filed on the last full day of the Reagan Administration, alleging that President Reagan, Vice President Bush, and the National Security Council ("NSC"), a component of the Executive Office of the President, "intend[ed] to delete material from the White House computer systems in violation of the FRA and the PRA." *Id.* at 286. The *Armstrong* plaintiffs sought to preserve access to these computer records, which contained emails and other communications of administration officials over the course of several years. *Id.* at 286–87. The plaintiffs sought a "declaration that many of the documents stored in the [computer] system at the close of the Administration are federal and presidential records" and an "injunction prohibiting the destruction of these documents and directing the President and NSC to classify and preserve the documents as required by the FRA and PRA." *Id.* at 287.

The D.C. Circuit, however, rejected the plaintiffs' claims for relief under the PRA. It

11

explained that although the PRA "contains no provision expressly precluding judicial review," "the PRA is one of the rare statutes that does impliedly preclude judicial review." *Id.* at 290. The court based this holding on a recognition that "permitting judicial review of the President's compliance with the PRA would upset the intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns." *Id.* On the one hand, "Congress sought to establish the public ownership of presidential records and ensure the preservation of presidential records for public access after the termination of a President's term in office." *Id.* On the other hand, Congress was "keenly aware of the separation of powers concerns that were implicated by legislation regulating the conduct of the President's daily operations," and thus "sought assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive branch control over presidential records during the President's term in office." *Id.* With the PRA, Congress resolved these competing concerns by "requiring the President to maintain records documenting the policies, activities, and decisions of his administration, but leaving the implementation of such a requirement in the President's hands." *Id.*

The court in *Armstrong I* recognized that the PRA's statutory scheme reflects this balance by, among other things, significantly limiting the Archivist's role, particularly when compared to the Archivist's responsibilities and authorities under the FRA. *Id.* (observing that the PRA, unlike the FRA, does not authorize the Archivist to promulgate guidelines and regulations governing the President's records management system, nor does the PRA authorize the Archivist to inspect the President's records or records management practices). Indeed, unlike the FRA, the PRA also omits any express enforcement role for the Archivist or the Attorney General with respect to the disposal of records while the President is in office. *See id.* (recognizing that the Archivist has no "authority

to veto the President's . . . decision[s]" regarding records disposal and that Congress can only do so by passing legislation prohibiting disposal of particular documents); *cf.* 44 U.S.C. § 2112(c) (recognizing the Archivist assumes, with respect to Presidential records, "all the functions and responsibilities otherwise vested in him pertaining to Federal records" only after they have already been deposited, after the President has left office).

Given Congress' clear intent to limit any administrative interference with the President's records management practices, the court in *Armstrong I* also rejected the prospect of a judicial oversight role, finding no suggestion in the PRA that Congress intended "courts, at the behest of private citizens, to rule on the adequacy" of such practices, or to "overrule [the President's] records creation, management, and disposal decisions." *Armstrong I*, 924 F.3d at 290. Ultimately, the court declined to "second-guess" Congress's decision "[not] to give outsiders the right to interfere with White House recordkeeping practices," but instead simply to "rel[y] on the fact that subsequent Presidents would honor their statutory obligations to keep a complete record of their administrations." *Id.* at 290–91. In short, the court held "that the PRA precludes judicial review of the President's recordkeeping practices and decisions." *Id.* at 291. Accordingly, the court dismissed the *Armstrong* plaintiffs' claims seeking injunctive and declaratory relief under the PRA. *See id.* at 287, 291.

Plaintiffs' claims in this case present a thinly disguised effort to relitigate *Armstrong I*. Although *Armstrong I* held that courts have no role in policing the President's compliance with the PRA, Plaintiffs ask this Court to do just that. Indeed, Plaintiffs call on the Court to review the President's decisions in the very areas where, under *Armstrong I*, judicial review is squarely precluded. In *Armstrong II*, the D.C. Circuit recognized that its decision in *Armstrong I* meant that "courts may not review any decisions regarding *whether to create* a documentary presidential

13

record" while the President is in office, nor may they review "the day-to-day process by which presidential records are maintained," or the President's compliance with "the process outlined in 44 U.S.C. § 2203(c)–(e) for disposing of presidential records." *Armstrong II*, 1 F.3d at 1294 (emphasis in original).

Yet just as in *Armstrong I*, Plaintiffs here are asking the Court to review the "President's records management practices" and to "overrule his records creation, management, and disposal decisions," *Armstrong I*, 924 F.2d at 290. *See, e.g.*, Compl. ¶ 75 (asking Court to review President's alleged decision not to "create and preserve records . . . of communications the President and his top advisors have with foreign leaders either in person or by telephone"); *id.* ¶ 76 (alleging that the President "personally as well as by and through his staff" engages in "a policy and practice of refusing to create records of his meetings and conversations with foreign leaders; by seizing interpreter's notes . . . ; and by destroying or ordering the disposal of presidential records without obtaining the Archivist's views in writing or producing a disposal schedule to Congress").

In *CREW*, the plaintiffs conceded, and the D.C. Circuit confirmed, that, under the *Armstrong* cases, "courts have no jurisdiction to review the President's 'day-to-day operations.'" *CREW*, 924 F.3d at 609. Plaintiffs now seek to evade this prior concession by purporting to challenge a "policy and practice" of refusing to create certain records, *see* Compl. ¶ 76, which presumably would go beyond such "day-to-day operations." However, Plaintiffs point to no written policy that, in their view, violates the PRA. To the contrary, the court in *CREW* has already recognized that the White House's written policy, as reflected in a 2017 memorandum issued to White House staff ("2017 Memo"), "does just what the PRA requires." *See id.*[4] Plaintiffs'

---

[4] *See generally* Memorandum for All Personnel Regarding Presidential Records Act Obligations (Feb. 22, 2017), https://go.usa.gov/xEckn (National Archives).

references to isolated instances, such as the President's alleged taking of an interpreter's notes, do not plausibly establish a "policy and practice" of refusing to create records. If these allegations were enough to create a judicially-reviewable "policy or practice," there would be nothing left of the preclusion of judicial review in *Armstrong I*.

Moreover, neither *Armstrong I* nor *Armstrong II* limited the bar on judicial review to "day-to-day operations," nor did either case suggest that the bar could be avoided simply by challenging a "policy and practice." Rather, in the PRA context, *any* challenge to the President's decisions or practices regarding records creation—that is, whether to create records or not—is barred, even if those decisions or practices reflect an ongoing policy. *See Armstrong II*, 1 F.3d at 1294 ("Thus, the courts may not review any decisions regarding *whether to create* a documentary presidential record.").[5] Judicial review of Plaintiffs' claims is therefore precluded, and they can establish no clear and indisputable right to relief for that reason alone.

## B.      The Exception in *Armstrong II* Does Not Apply Here

Plaintiffs also appear to suggest that their claims here can proceed under an exception that the D.C. Circuit recognized in its later *Armstrong II* decision. *See* Compl. ¶ 74(c) (citing *Armstrong II*). But that narrow exception does not apply here. *Cf. Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 845 F. Supp. 2d 288, 297 (D.D.C. 2012) (recognizing that "the actual holding of [*Armstrong II*] is much more narrow than this language that plaintiff recites"). In *Armstrong II*,

---

[5] Plaintiffs also may be thinking of the limitation that courts have applied to claims seeking correction of FRA violations under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Courts have recognized that such claims must satisfy the APA's "agency action" requirement, so claims challenging an agency policy may be permitted while those that either mount a "broad programmatic attack" or challenge specific acts of noncompliance are not. *See, e.g.*, *CREW v. U.S. Dep't of Homeland Security*, No. 18-2473, -- F. Supp. 3d --, 2019 WL 2248527, at *15-*16 (D.D.C. May 24, 2019). In the PRA context, however, the APA does not apply, and judicial review is precluded regardless of whether a plaintiff challenges a discrete action or an ongoing policy.

the plaintiffs had dropped their PRA claims entirely. *Armstrong v. EOP*, 810 F. Supp. 335, 337 n.1 (D.D.C. 1993). Instead, they invoked the FRA and FOIA to argue that guidelines issued by the White House improperly classified certain material as Presidential records when in fact they qualified as "agency records subject to the FRA." *See Armstrong II*, 1 F.3d at 1290.[6] The court in *Armstrong II* held that, when facing such a claim, "courts may review guidelines outlining what is, and what is not, a 'presidential record,'" as opposed to a federal record. *Id.* at 1294. But *Armstrong II* was careful to stress that the earlier holding in *Armstrong I* remains robust. As *Armstrong II* emphasized, the President's records creation, management, and disposal decisions remain outside the scope of permissible judicial review, and, in particular, "the courts may not review any decisions regarding *whether to create* a documentary presidential record." *Armstrong II*, 1 F.3d at 1294.

Plaintiffs' claims fall well outside the limited exception that *Armstrong II* identified. Unlike in *Armstrong II*, Plaintiffs have not asserted a claim against any White House component that is subject to the FRA, nor have they identified any federal agency subject to the FRA as a defendant in this case. In addition, Plaintiffs point to no guideline setting forth a definition of Presidential records that, in their view, captures records that are in fact an agency's federal records. Nor could they. For one thing, the 2017 Memo circulated to White House staff sets forth a definition of "Presidential records" that limits such records to those covered by the PRA, *see CREW*, 924 F.3d

---

[6] It should be noted that, at the time of *Armstrong II*, NSC, the EOP component whose guideline was at issue, considered itself to be subject to the FRA. *See id.* In a later decision in the *Armstrong* case, the D.C. Circuit held that the NSC in fact was not governed by the FRA because, as an EOP component with the primary function of advising and assisting the President, it did not qualify as an agency subject to FOIA. *Armstrong III*, 90 F.3d 553, 567 (describing post-*Armstrong II* Office of Legal Counsel opinion determining that NSC was not a "federal agency," and ultimately holding, consistent with that opinion, that NSC was not an agency subject to FOIA and therefore was not required to comply with the FRA).

at 607 (quoting PRA definition), and Plaintiffs do not challenge that definition. As the D.C. Circuit recognized in CREW, the 2017 Memo "does just what the PRA requires." *Id.*

Rather than challenging a specific definition appearing in a guideline, as the court in *Armstrong II* suggested may be permissible, Plaintiffs rely on the notion that the President "seiz[ed]" an interpreter's notes and "effectively classif[ied] them as presidential records." Compl. ¶ 76. But this assertion does nothing to bring Plaintiffs' claims within the *Armstrong II* exception. Plaintiffs cite newspaper articles reporting that, according to an unidentified source, the President took possession of an interpreter's notes after a July 2017 meeting with President Putin in Hamburg. Compl. ¶ 42. However, the same *Washington Post* article that originally reported this allegation acknowledged that it had no information on "whether Trump has taken notes from interpreters on other occasions."[7] Indeed, Plaintiffs acknowledge that, according to the same article, an interpreter left a different meeting between the President and President Putin "with pages of notes," Compl. ¶ 51—which indicates that, on that occasion, the President did *not* take them. Thus, even if the Court deems plausible the allegation that the President took an interpreter's notes after one meeting in 2017, Plaintiffs cite nothing to suggest that this was more than a single occurrence. The President's alleged action thus is in no way equivalent to an allegedly overly broad definition in a guideline, such as that reviewed by the Court in *Armstrong II*. To the contrary, a single action like the one Plaintiffs describe at most raises a question of day-to-day compliance— which is precisely what the D.C. Circuit recognized in *CREW* could not be subject to judicial review. *See CREW*, 924 F.3d at 606 (recognizing that the court "would have no jurisdiction to

---

[7] *See* Greg Miller, Trump has concealed details of his face-to-face encounters with Putin from senior officials in administration, *Washington Post*, Jan. 13, 2019, available at https://www.washingtonpost.com/world/national-security/trump-has-concealed-details-of-his-face-to-face-encounters-with-putin-from-senior-officials-in-administration/2019/01/12/65f6686c-1434-11e9-b6ad-9cfd62dbb0a8_story.html.

order the correction of any defects in the White House's day-to-day compliance with the [2017] Memo's records-preservation policy").

Plaintiffs' allegations regarding the interpreter's notes also fail to bring their claim within the *Armstrong II* exception because Plaintiffs do not plausibly raise the type of binary question suggested in *Armstrong II*, regarding whether certain documents qualify as either federal records or Presidential records. Plaintiffs allege, based on second-hand reporting, that the President took possession of certain notes, but Plaintiffs assert no facts that plausibly suggest that the notes would otherwise have qualified as "federal records" covered by the FRA. *See Iqbal*, 556 U.S. at 678 (in order to be plausible, factual allegations must suggest more than a "sheer possibility that a defendant acted unlawfully"). Plaintiffs acknowledge that the State Department's Foreign Affairs Manual ("FAM") indicates that interpreters assigned to United States officials for meetings with foreign officials are employees or contractors of the State Department, but the FAM sections governing language services nowhere suggest that such interpreters are responsible for creating records of the meetings where they are serving as interpreter. *See* 6 FAM 1510–1540.[8] Indeed, Plaintiffs acknowledge that interpreters "[a]re not there to create a record of the conversation." Compl. ¶ 57.[9] An equally, if not more, plausible purpose of such notes might be to aid the interpreter's own short-term memory—as needed, for example, for certain complex words or phrases—while performing the challenging task of real-time language interpretation. Such notes would not be of "informational value," nor would they otherwise meet the definition of "record"

---

[8] The FAM is available at https://fam.state.gov/search.

[9] Elsewhere in the Complaint, Plaintiffs cite a single example of a "memorandum of conversation" prepared by an interpreter in 1965. *See* Compl. ¶ 43. However, the fact that an interpreter prepared such a record once over fifty years ago does not render plausible the notion that interpreters today regularly engage in such a practice, nor that they take notes sufficient to do so.

for purposes of the FRA, as set forth in 44 U.S.C. § 3301(a)(1)(A).[10] This alternative possibility—

that an interpreter's written notes are simply a real-time tool the interpreter uses while engaged in

the immediate task of oral interpretation—is not only the more obvious one, but is also entirely

incompatible with the notion that such notes would instead reflect an interpreter's attempt, even

while immersed in the ongoing task of interpreting, to "document" the meeting itself. The

existence of a more obvious, incompatible possibility defeats the plausibility of Plaintiffs'

assertions. *See In re U.S. Office of Personnel Mgmt. Data Security Breach Litig.*, 928 F.3d 42, 57

(D.C. Cir. 2019) (observing that, in both *Iqbal* and *Twombly*, the Court rejected the plausibility of

the plaintiffs' assertions in part because an alternative, more obvious explanation was incompatible

with the plaintiffs' suggestion).

In the absence of any plausible allegation that interpreters' notes qualify as federal records

governed by the FRA, the possibility that the President took possession of such notes, and thereby

made them Presidential records, does not support judicial review. Plaintiffs' allegations thus fail

to support application of the *Armstrong II* exception.

## II.  PLAINTIFFS FAIL TO ESTABLISH THE ELEMENTS NECESSARY FOR MANDAMUS JURISDICTION (CLAIM ONE)

In addition to the bar on judicial review of Defendants' alleged PRA violations—which by

---

[10] To the extent such notes are intended to assist anyone other than the interpreter, it would clearly be the President, as the one conducting the meeting, who retains an interest in the notes, as well as the authority to use them as he deemed appropriate, rather than the State Department. In *Judicial Watch Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013), the court held that Secret Service logs of visitors to the President and other non-agency White House components were not agency records within the meaning of FOIA, among other reasons because the President could not reasonably be forced to "surrender [his] constitutional prerogative of maintaining secrecy regarding his choice of visitors (and therefore of outside advisors), or to decline to cooperate with the executive branch agency entrusted with (and necessary for) his personal protection." *Id.* at 221 (internal quotation omitted)). In the context of meetings with foreign leaders, the President should similarly not be forced to forego control over the content of such meetings as a condition of obtaining the necessary assistance of a State Department interpreter.

itself requires dismissal of this case in its entirety—this Court lacks jurisdiction over Plaintiffs'

Claim One for a separate reason: namely, their failure to satisfy the elements necessary to establish

mandamus jurisdiction. Claim One seeks mandamus relief that would compel Defendants to

comply with the PRA. Mandamus jurisdiction "is strictly confined. . . Mandamus is 'drastic'; it is

available only in 'extraordinary situations'; it is hardly ever granted; those invoking the court's

mandamus jurisdiction must have a 'clear and indisputable' right to relief.'" *In re Cheney*, 406

F.3d 723, 729 (D.C. Cir. 2005) (en banc); *accord CREW*, 924 F.3d at 606 ("[T]he remedy of

mandamus is a drastic one, to be invoked only in extraordinary situations."). In order to establish

a court's jurisdiction over such a claim, a plaintiff seeking mandamus relief must show (1) a "clear

and indisputable right to relief," (2) that the defendant has a "clear duty to act," and (3) that "no

adequate alternative remedy exists." *Id.* (quoting *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189

(D.C. Cir. 2016)). Even when these requirements are met, "a court may grant relief only when it

finds compelling equitable grounds." *Am. Hosp. Ass'n*, 812 F.3d at 189 (internal quotation

omitted). As discussed below, Plaintiffs fail to establish either the first or the second requirement.

### A.    Plaintiffs Cannot Establish a Clear Right to Relief

In assessing whether Plaintiffs are entitled to mandamus, the first question is whether they

have a "clear and indisputable" right to relief. *Id.* On that score, Plaintiffs are in trouble. "The party

seeking mandamus has the burden of showing that its right to issuance of the writ is clear and

indisputable." *Id.* (internal quotation omitted). Here, not only does the PRA lack any private right

of action, *see Judicial Watch, Inc.*, 845 F. Supp. 2d at 299 n.5, but, as discussed above, the D.C.

Circuit has concluded that it affirmatively precludes judicial review. In light of this affirmative

bar, Plaintiffs cannot possibly establish a "clear and indisputable" right to relief. Their mandamus

claim necessarily fails for that reason alone.

In the D.C. Circuit's recent *CREW* decision, the court considered a claim that, like the one here, sought mandamus relief based on alleged PRA violations—in that case, seeking to compel the White House to implement records management guidelines with respect to message-deleting apps. *See CREW*, 924 F.3d. at 605. The court in *CREW* recognized that the preclusion of judicial review, as established in *Armstrong I*, failed to support the "clear right to relief" prong of mandamus jurisdiction. *See id.* at 609. The same conclusion is warranted here. Indeed, that bar suffices, on its own, to require dismissal of Plaintiffs' mandamus claim.

Even if review were theoretically available, the court in *CREW* also identified another reason for its conclusion—the absence of any plausible allegation that the White House was "defying the law." *Id.* The court concluded that the plaintiffs "failed to do so" because, for one thing, the White House's 2017 Memo specifically required that Presidential records conveyed through instant messaging systems be preserved, and, indeed, did "just what the PRA requires" in its overall directions to White House personnel regarding their obligations to preserve and maintain Presidential records. *See id.* at 606–07.

Plaintiffs here have also failed to plausibly allege that Defendants "are, in effect, defying the law." *See id.* at 606. Nothing in Plaintiffs' allegations establish that the White House is defying the law when it comes to its records creation, management, or disposal policies and practices. Indeed, the 2017 Memo again forecloses any such notion by recognizing that "[t]he PRA requires that the Administration take steps 'to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained.'" 2017 Memo at 1. In their attempt to suggest that, despite this acknowledgement, the White House in fact seeks to disregard the PRA, Plaintiffs rely on secondhand newspaper accounts

21

of unattributed or speculative statements of third parties, and on letters sent by Members of Congress that are themselves based on those same secondhand accounts. *See* Compl. ¶¶ 41–62. Such accounts cannot support the plausibility of Plaintiffs' claims. *E.g.*, *Arroyo v. City of Buffalo*, No. 15-cv-753A, 2017 WL 3085835, at *5 (W.D.N.Y. July 20, 2017) (newspaper articles did not provide facts that a plaintiff might be prepared to prove at a later stage of proceedings when they relied on unidentified sources), *report & recommendation adopted*, 2018 WL 488943 (W.D.N.Y. Jan. 20, 2018).

Indeed, the D.C. Circuit in *CREW* rejected a similar argument because, even assuming that news articles raise "questions about 'what is actually happening in the White House,'" "these types of 'open questions' regarding the precise scope and effect of the facially PRA-compliant February 2017 Memo 'are the antithesis of the "clear and indisputable" right needed for mandamus relief.'" *CREW*, 924 F.3d at 608. The Court should reject Plaintiffs' claims here for the same reason.

Moreover, Plaintiffs fail to plausibly allege that the President has defied the law. For one thing, in the absence of any plausible allegation that the interpreter's notes constituted federal records governed by the FRA, nothing in the FRA or PRA would have prohibited the President from taking possession of the notes, as Plaintiffs allege. Plaintiffs also suggest that the President has failed to meet his PRA obligations because, according to news reports, the President has deemed it appropriate to meet one-on-one with foreign leaders, without an official note taker present. However, courts have repeatedly recognized that the President has virtually unfettered discretion regarding the creation, management, and disposal of Presidential records during his term in office. *See Armstrong I*, 924 F.3d at 290; *Armstrong II*, 1 F.3d at 1294. As described above, this discretion encompasses the President's "decisions regarding *whether to create* a documentary presidential record." *Id.* Thus, an allegation that the President has failed to create certain records

22

simply cannot, as a matter of law, plausibly assert a PRA violation.

This is all the more true when it comes to the President's meetings with foreign leaders. The Constitution vests "plenary and exclusive power" in the President to act "as the sole organ of the federal government" in many areas of international relations. *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (recognizing the President's exclusive authority to negotiate treaties); *cf. Zivotofsky ex rel. Zivotofsy v. Kerry*, 135 S. Ct. 2076, 2086 (2015) (recognizing the President's exclusive authority to recognize foreign governments because on such matters, "the Nation must 'speak . . . with one voice,'" and "[t]hat voice must be the President's" (internal quotation and citation omitted)); *see also PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 107 (D.C. Cir. 2018) ("'The President has broad authority in the field of foreign affairs.'"). The President's authority in this area necessarily encompasses the power "to speak and bargain effectively with other nations." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 382 (2000).

It is thus up to the President to decide how best to negotiate with other countries, and who should be present in meetings with foreign leaders. It is not up to the courts to impose restrictions on the President's ability to negotiate effectively with foreign nations. Any interpretation of the PRA that would limit the President's authority in this key area would encroach on the very Article II powers that prior cases have expressly recognized. Because Plaintiffs fail to establish that the President is defying the law, they also lack any clear right to relief that could support mandamus jurisdiction.

**B.      Plaintiffs Cannot Establish a Clear Duty to Act**

Because Plaintiffs fails to establish a clear right to relief, the Court "may 'begin and end with the first' of the three mandamus requirements," and may dismiss Plaintiffs' Claim One without addressing the other two requirements. CREW, 924 F.3d at 609. However, Plaintiffs also

fail to establish the second prong of mandamus jurisdiction—that Defendants are violating a clear duty to act. *See Am. Hosp. Ass'n*, 812 F.3d at 189. In the context of mandamus, the duty to be performed must be "ministerial and the obligation to act peremptory, and clearly defined." *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931)). A ministerial duty "is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

Plaintiffs rely on the notion that the PRA imposes "mandatory obligations" on the President in regard to his creation, management, and disposal of records. Compl. ¶ 74. They then claim that the President has violated those obligations particularly in the context of meetings with foreign leaders. *Id.* ¶ 76. However, the PRA does not set forth any ministerial duty owed by the President to Plaintiffs. As relevant here, the statute provides that the President "shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records pursuant to the requirements of this section and other provisions of law." 44 U.S.C. § 2203(a). Rather than defining any clear or ministerial duty appropriate for mandamus relief, the PRA leaves it to the President to determine what steps are "necessary" for this purpose. Thus, as discussed above, courts have not viewed the PRA as imposing ministerial obligations on the President. To the contrary, the President's "virtually complete control" over records creation, management and disposal during his term of office, *see Armstrong* I, 924 F.3d at 290, is entirely incompatible with the notion that he is subject to such ministerial obligations, as is his Article II authority in matters of foreign affairs, and particularly in the President's negotiations with foreign leaders, *see Crosby*,

530 U.S. at 382.[11]

The President's authority would be undermined if the PRA were interpreted to dictate specific procedures for adequately documenting the President's meetings with foreign leaders. Certainly, the text of the PRA does not identify any particular method for documenting meetings, nor does it require that documentation must occur simultaneous with the meeting itself, rather than afterwards, nor does it require a specified level of detail in order for documentation of a meeting to be "adequate." The PRA therefore cannot be interpreted to impose ministerial duties on the President in connection with his meetings with foreign leaders that can be enforced through mandamus relief.

## C.       No Writ of Mandamus Can Lie Against the President

Aside from Plaintiffs' failure to satisfy the requirements for mandamus jurisdiction, Plaintiffs' request that the Court issue a writ of mandamus to the President disregards controlling authority that makes clear that "[w]ith regard to the President, courts do not have jurisdiction to enjoin him." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citing *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 501 (1867)), and *Franklin v. Massachusetts*, 505 U.S. 788, 827–28 (1992) (Scalia, J., concurring in part and concurring in the judgment)); *see also id.* at 1012 ("A court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions."). As the D.C. Circuit observed in *Swan,* it has "never attempted to exercise

---

[11] Even if Plaintiffs had identified any ministerial obligation that the PRA imposes on Defendants, they fail to allege a violation of any such duties *owed to Plaintiffs*. *See* 28 U.S.C. § 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed *to the plaintiff*." (emphasis added)). Any duties created by the PRA are owed not to Plaintiffs, but to the public at large. *See, e.g.*, *Armstrong I*, 924 F.2d at 290 ("Congress sought to establish the *public* ownership of presidential records and ensure the preservation of presidential records for *public* access after the termination of a President's term in office." (emphasis added)). For this reason also, Plaintiffs cannot obtain mandamus relief.

power to order the President to perform a ministerial duty," explaining that "[t]he reasons why courts should be hesitant to grant such relief are painfully obvious": the President "is a coequal branch of government, and for the President to 'be ordered to perform particular executive . . . acts at the behest of the Judiciary,' . . . at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Swan*, 100 F.3d at 978 (citations omitted; ellipsis in original) (quoting *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment)). In light of this authority, a member of this Court has recently concluded that "[t]his Court should not grant mandamus, injunctive, or declaratory relief against a sitting President to require performance of a ministerial duty." *Lovitky v. Trump*, No. 19-cv-1454, 2019 WL 3068344, at *10 (D.D.C. July 12, 2019). The same conclusion applies here. Indeed, even if not a matter of the Court's jurisdiction, the Court should refrain, as a matter of its equitable discretion, from issuing such relief against the President due to the extraordinary separation of powers concern that it would raise. Plaintiffs' Claim One therefore should be dismissed for this reason as well.

## III.   IN THE ABSENCE OF MANDAMUS JURISDICTION, PLAINTIFFS' CLAIMS SEEKING DECLARATORY RELIEF CANNOT PROCEED (CLAIMS TWO, THREE, AND FOUR)

Claims Two, Three, and Four of Plaintiffs' Complaint seek declaratory relief based on the same factual allegations advanced to support Plaintiffs' mandamus request in Claim One. *Compare* Compl. ¶ 76 (Claim One), *with id.* ¶¶ 81–82 (Claim Two), 87 (Claim Three), 96–97 (Claim Four). However, the Declaratory Judgment Act, 28 U.S.C. § 2201, simply "enlarged the range of remedies availability in the federal courts"; it did not "extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Thus, "the availability of [declaratory] relief presupposes the existence of a judicially remediable right." *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011). "Accordingly, courts in this circuit have generally found that [a] count for

declaratory judgment is not cognizable as a separate cause of action but is more properly included in the[] prayer for relief." *Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*, 369 F. Supp. 3d 27, 38 (D.D.C. 2019) (internal quotation omitted). Consistent with these rulings, the D.C. Circuit in *CREW* concluded that its dismissal of the plaintiff's mandamus claim "also disposes of CREW's claims for declaratory relief." *CREW*, 924 F.3d at 610 ("For the same reasons that we decline to 'resort to mandamus' to micromanage the President's day-to-day compliance with the PRA, we shall 'not entertain [a claim] for declaratory relief.'"). Here as well, the Court should dismiss Claims Two, Three, and Four for the same reasons explained above with respect to Claim One.[12]

## IV.   PLAINTIFFS ARE NOT ENTITLED TO RELIEF UNDER THE TAKE CARE CLAUSE FOR ALLEGED STATUTORY VIOLATIONS (CLAIM FIVE)

In Claim Five, Plaintiffs attempt to repackage their allegations of PRA and FRA violations as a separate claim brought directly under the Constitution's Take Care Clause. See Compl. ¶ 102 (alleging that the President has violated the Take Care Clause "by directing or causing violations of the PRA and FRA"). This claim should also be dismissed. For one thing, no court has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief against the Executive.   *Cf. Am. Fed'n of Gov't Employees, AFL-CIO v. Trump*, 318 F. Supp. 3d 370, 439 (D.D.C. 2018) ("As an initial matter, it is not at all clear that a claim under the Take Care Clause

---

[12] Plaintiffs' Claim Three purports to seek a declaratory judgment against Defendants under the FRA as well as the PRA. Compl. ¶¶ 86–93. However, the President is not subject to the FRA, and Plaintiffs identify no EOP component subject to the FRA as a target of their challenge. *See, e.g., Armstrong III*, 90 F.3d at 567 (holding NSC is not an "agency" under FOIA and thus is not subject to the FRA); *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998) ("[I]t has never been thought that the whole [EOP] could be considered a discrete agency under FOIA."). Plaintiffs' invocation of the FRA in Claim Three thus appears solely aimed at bringing their claim within the *Armstrong II* exception to the preclusion on review of alleged PRA violations, rather than attempting to assert an independent claim under the FRA—which, if cognizable at all, could only be brought pursuant to the APA, 5 U.S.C. § 706. *Cf. CREW v. U.S. Dep't of Homeland Security*, 527 F. Supp. 2d 101, 110 (D.D.C. 2007). Plaintiffs assert no APA claim here, nor could they. Claim Three should therefore be dismissed for the reasons explained above.

presents a justiciable claim."); *CREW*, 302 F. Supp. 3d at 130 ("Whether claims brought directly under the Take Care Clause are even justiciable is open to debate.").  Courts that have considered the issue have either failed to resolve it or have rejected the availability of such claims. Indeed, in *Mississippi*, the Supreme Court held that courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." 71 U.S. at 501. This principle certainly applies when Presidential action requires "the exercise of judgment," *id.* at 499, as it does in the President's negotiations with foreign leaders. *See also Dalton* v. *Specter*, 511 U.S. 462, 474–75 (1994) (judicial review of discretionary Presidential decisions "is not available"); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992) (holding that it would be improper for the courts to take over the President's duty to "take Care that the Laws be faithfully executed").

Moreover, it should also be clear that the Take Care Clause cannot be used simply to circumvent existing limits on statutory review. Here, where judicial review of the President's compliance with the PRA is squarely precluded, as explained above, Plaintiffs cannot obtain the same relief by making the same allegations under the guise of a constitutional claim. *See, e.g.*, *Dalton*, 511 U.S. at 471 (rejecting argument "that whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine"). If it were otherwise, the court's holding in *Armstrong I* would be meaningless, and indeed no statute could effectively preclude judicial review because a plaintiff could always bypass such a preclusion by raising the same claim under the Take Care Clause.

Plaintiffs' Take Care Clause claim here appears to be focused on the President's alleged "interference . . . with the duty of the Department of State to 'make and preserve records containing adequate and proper documentation'" of the President's meetings with foreign leaders, *see* Compl. ¶ 101, and thus relies primarily on their allegations, discussed above, regarding the President's

taking possession of an interpreter's notes following a 2017 meeting with President Putin. Because Plaintiffs are not entitled to mandamus or declaratory relief for this claim, for the reasons explained above, their attempt to seek the same relief under the Take Care Clause should be rejected.

Moreover, as explained above, Plaintiffs fail to plausibly assert that the interpreter's notes qualify as federal records governed by the FRA, nor that the President's alleged action was in violation of either the PRA or the FRA. Nor do Plaintiffs plausibly assert a duty on the part of the Department of State to adequately document meetings in which State officials do not even participate, other than, at most, through the presence of an interpreter whose sole function is to facilitate the President's communication. Even assuming that the Take Care Clause might allow a claim to proceed in certain circumstances, those circumstances are not present here. Plaintiffs' Claim Five therefore should be dismissed. *Cf. CREW*, 302 F. Supp. 3d at 140 (dismissing Take Care Clause claim based on alleged PRA violation).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims in their entirety, with prejudice.

Dated:  August 9, 2019                          Respectfully submitted,

                                                JOSEPH H. HUNT
                                                Assistant Attorney General
                                                MARCIA BERMAN
                                                Assistant Director, Federal Programs Branch

                                                */s/ Kathryn L. Wyer*
                                                KATHRYN L. WYER
                                                Federal Programs Branch
                                                U.S. Department of Justice, Civil Division
                                                1100 L Street, N.W., Room 12014
                                                Washington, DC  20005
                                                Tel. (202) 616-8475 / Fax (202) 616-8470
                                                kathryn.wyer@usdoj.gov
                                                *Attorneys for Defendants*