**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al*., <br><br> Defendants. | No. 19-cv-1333 ABJ |

## **DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ..................................................................................... 1

ARGUMENT ........................................................................................... 1

    I.     PLAINTIFFS FAIL TO OVERCOME THE PRA'S BAR ON JUDICIAL REVIEW ......................................................................................... 1

         A.     Armstrong I and II Recognize Congress's Intent To Preclude Judicial Review of Plaintiffs' Claims ............................................. 1

         B.     The Court Should Reject Plaintiffs' Invitation To Overrule *Armstrong I* ..................................................................... 7

    II.    PLAINTIFFS FAIL TO SHOW ENTITLEMENT TO MANDAMUS RELIEF ......................................................................................... 10

         A.     Plaintiffs Have Not Identified a Clear Right To Relief ................ 10

         B.     Plaintiffs Have Not Identified a Clear Duty To Act ..................... 14

         C.     Plaintiffs Fail To Show that Mandamus Relief Against the President Is Available ..................................................... 17

    III.   PLAINTIFFS CANNOT ESTABLISH ENTITLEMENT TO DECLARATORY RELIEF ..................................................... 18

    IV.   PLAINTIFFS HAVE NO VALID CLAIM UNDER THE TAKE CARE CLAUSE ............................................................................. 18

CONCLUSION ..................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758 (D.C. Cir. 1980) .....................17

*Agostini v. Felton*, 521 U.S. 203 (1997) ...........................................................................7

*Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991) .................... *passim*

*Armstrong v. Exec. Office of the President* ("*Armstrong II*"),
    1 F.3d 1274 (D.C. Cir. 1993) ........................................................................ *passim*

*Boumediene v. Bush*, 553 U.S. 723 (2008) .....................................................................17

*Brookens v. Acosta*, 297 F. Supp. 3d 40 (D.D.C. 2018), *aff'd sub nom. Brookens v. Dep't of Labor*, No. 18-5129, 2018 WL 5118489 (D.C. Cir. Sept. 19, 2018) .................7

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ....................................19

*CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009) ...............................................4, 15

*CREW v. EOP*, 587 F. Supp. 2d 48 (D.D.C. 2008) ..........................................................15

*CREW v. Pruitt* ("*Pruitt*"), 319 F. Supp. 3d 252 (D.D.C. 2018) .......................................7

*CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019) .......................................4, 10, 12, 13, 16

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ....................................6, 12

*Dalton* v. *Specter*, 511 U.S. 462 (1994) ..........................................................................20

*Judicial Watch Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013) ..........................6

*Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300 (D.C. Cir. 2014) ......................19

*Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010) ....................................................17

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977) ........................................................8

*NLRB v Canning*, 573 U.S. 513 (2014) ..........................................................................19

*PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75 (D.C. Cir. 2018) ...................12

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950) .......................................18

*United States v. Juarez-Escobar*, 25 F. Supp. 3d 774 (W.D. Pa. 2014) ..........................19

*United States v. Nixon*, 418 U.S. 683 (1974) ...................................................................17

*United States v. Torres*, 115 F.3d 1033 (D.C. Cir. 1997) ...................................................7

*Youngstown Sheet & Tube Co.*, 343 U.S. 579 (1952) ......................................................8, 9

**<u>Statutes</u>**

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 ...................................................2, 4

Administrative Procedure Act ("APA"), 5 U.S.C. § 706 .....................................................7

Declaratory Judgment Act, 28 U.S.C. § 2201 ..................................................................18

Federal Records Act ("FRA"),
      44 U.S.C. §§ 2101–2120, 2901–2911, 3101–3107, 3301–3314 ...........................2

Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§ 2201–2209 .................... *passim*

44 U.S.C. § 2203 ....................................................................................................... *passim*

44 U.S.C. § 3101 ...................................................................................................................5

## INTRODUCTION

Plaintiffs' allegations that the President has violated the Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§ 2201–2209, by failing to create records of his meetings with foreign leaders fall squarely within the bar on judicial review recognized by the D.C. Circuit in *Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991). Plaintiffs' Complaint asserts the same claims in three different ways in an effort to evade *Armstrong*'s holding, but whether they invoke mandamus jurisdiction, the Declaratory Judgment Act, or the Take Care Clause, their efforts necessarily fail in the face of *Armstrong*'s binding authority. Recognizing this, Plaintiffs' opposition brief adds a fourth prong to their attack, suggesting that the Court simply ignore *Armstrong* altogether. Of course, this Court cannot do that, and Plaintiffs anyway cite no valid basis for their suggestion. As *Armstrong* requires, the Court should dismiss Plaintiffs' claims.

## ARGUMENT

### I.   PLAINTIFFS FAIL TO OVERCOME THE PRA'S BAR ON JUDICIAL REVIEW

#### A.   *Armstrong I* and *II* Recognize Congress's Intent To Preclude Judicial Review of Plaintiffs' Claims

Under the well-established authority of this Circuit, judicial review of Plaintiffs' claims is precluded. *Armstrong I* held that the PRA precludes judicial review "of the president's general compliance with the PRA," including "the adequacy of the President's records management practices" as well as the President's "records creation, management, and disposal decisions." *Armstrong I*, 924 F.2d at 290–91. The court's later decision in *Armstrong v. Exec. Office of the President* ("*Armstrong II*"), 1 F.3d 1274 (D.C. Cir. 1993), confirmed that this bar encompasses the President's compliance with his obligations under 44 U.S.C. § 2203, including "any decisions regarding *whether to create* a documentary presidential record," as well as "the day-to-day process by which presidential records are maintained," and "the process outlined in 44 U.S.C. § 2203(c)–

(e) for disposing of presidential records." *Armstrong II*, 1 F.3d at 1294. Although this preclusion of judicial review under the PRA is sweeping, there can be no dispute that the D.C. Circuit recognized such a broad bar. Its reasoning in doing so was simple. The court held that, in light of separation of powers concerns, Congress did not intend to rely on the courts to enforce the President's compliance with the PRA's requirements, but instead "relied on the fact that subsequent Presidents would honor their statutory obligations." *Armstrong I*, 924 F.2d at 290.

Plaintiffs attempt to evade the clear holdings of *Armstrong I* and *II*, noting that *Armstrong II* rejected an "unequivocal proposition that *all* decisions made pursuant to the PRA are immune from judicial review." *See* Pl. Opp. at 15 (emphasis added) (quoting *Armstrong II*, 1 F.3d at 1293). But in fact, the *only* PRA-related decisions that the court in *Armstrong II* subjected to judicial review are those involving "the initial classification of materials as presidential records." *Armstrong II*, 1 F.3d at 1293. The court carved out that exception in the narrow circumstance where such initial classification determinations implicated a competing statutory scheme—that set forth in the Federal Records Act ("FRA"), 44 U.S.C. Titles 21, 29, 31, 33, and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, which allow not only for broader judicial review but also for broader public access to the records covered by those statutes. It was only to avoid "render[ing] the FOIA a nullity," and to prevent the PRA from being used to "shield *all* federal records," rather than only Presidential records, "from the provisions of the FRA," that review of guidelines setting forth initial classification criteria would be allowed. *See id.* (emphasis added). Significantly, the court contrasted that narrow category of "initial classification" guidelines with the far broader category of decisions, covering the "creation, management, and disposal" of Presidential records, that are "described in the provisions of 44 U.S.C. § 2203," where judicial review is squarely precluded. *Armstrong II*, 1 F.3d at 1294.

Try as they might, Plaintiffs cannot fit the claim they wish to make here into the *Armstrong II* exception. Fundamentally, their claim is that Defendants fail to adequately document and properly maintain records relating to their meetings with foreign leaders, as required by 44 U.S.C. § 2203. Compl. ¶¶ 76, 81, 92; Pl. Opp. at 16–17 (recognizing that, "[a]t its core," Plaintiffs' complaint challenges an alleged refusal to create written records of meetings with foreign leaders). Plaintiffs also assert that Defendants have failed to follow the records disposal procedures required by 44 U.S.C. § 2203. Compl. ¶ 76, 98. These claims, regarding the "creation, management, and disposal" of Presidential records, fall squarely within the category of precluded claims identified in *Armstrong I* and *II. See Armstrong II*, 1 F.3d at 1294.

Plaintiffs' suggestions to the contrary are unconvincing. Plaintiffs largely rely on a tortured characterization of their own claim, asserting their intent to challenge "a policy and practice of excluding from the PRA an entire class of activities: top-level meetings between the President and certain foreign leaders." Pl. Opp. at 19. But by "excluding" a "class of activities" "from the PRA," Plaintiffs simply mean that the President allegedly fails to create records adequately documenting those activities in accord with 44 U.S.C. § 2203(a). *See* Pl. Opp. at 19 (citing § 2203(a)). And under *Armstrong I* and *II*, Defendants' compliance with the requirements of § 2203 is precisely what the Court cannot review.

There is no genuine issue of "classification" here at all. Plaintiffs have not plausibly asserted that records of the President's meetings with foreign leaders would be anything other than Presidential records, if they were created. To the contrary, the entire premise of their assertion that the President has failed to satisfy the PRA's "adequate documentation" requirement, when it comes to meetings with foreign leaders, is that the President is failing to create *Presidential* records. Nor have Plaintiffs plausibly asserted that Defendants have categorized such records

inappropriately. Unlike in *Armstrong II*, Presidential records documenting the President's meetings with foreign leaders could not be immediately sought from an agency through FOIA, so the rationale of *Armstrong II*, that a category of records may have been classified as Presidential when they were actually federal records, and thus may have been improperly removed from the reach of FOIA, does not apply. *See Armstrong II*, 1 F.3d at 1293 (indicating the concern that "a non-presidential document subject to the FOIA could be forever removed from that statute's provisions if it were improperly classified as a presidential record and destroyed").[1] Plaintiffs also make no suggestion that Defendants have classified records of the President's meetings with foreign leaders as personal records—unlike the situation in *CREW v. Cheney*, 593 F. Supp. 2d 194, 215 (D.D.C. 2009), upon which Plaintiffs rely.[2]

---

[1] Although Presidential records become subject to FOIA five years after the President leaves office, that future possibility did not affect the conclusion of the court in *Armstrong I* and *II* that the President's compliance with the PRA was otherwise unreviewable. To the contrary, the court in *Armstrong II* expressly recognized that one result of the balance that Congress had struck in the PRA was that Presidential records might be disposed of before a President leaves office, and that any such disposal decisions are unreviewable. *See Armstrong II*, 1 F.3d at 1293. That possibility contributed to the court's rationale for deeming initial classification decisions reviewable, but it did not affect the court's broader conclusion that Congress did not intend the President's records creation, management, and disposal decisions to be subject to judicial review. *See id.* Along the same lines, Plaintiffs' argument that, if read to bar their claims, *Armstrong II* "would allow the President to decline to create any records whatsoever, subject to no judicial check," Pl. Opp. at 21, misses the mark. As the D.C. Circuit recognized, Congress in the PRA did not intend for the courts to "check" the President when it comes to his compliance with 44 U.S.C. § 2203; instead, it "relied on the fact that subsequent Presidents would honor their statutory obligations." *Armstrong I*, 924 F.2d at 290. Here, for example, the White House's 2017 memo does "just what the PRA requires" in directing White House personnel to preserve and maintain Presidential records. *CREW v. Trump*, 924 F.3d. 602, 607 (D.C. Cir. 2019).

[2] Significantly, in the same *CREW v. Cheney* decision cited by Plaintiffs, the court granted summary judgment to the government. *Id.* at 233. The government therefore had no occasion to appeal the court's ruling that mandamus relief could be sought in the narrow circumstance presented there. In any event, the claim in *Cheney*, that the Vice President was improperly designating certain records as "personal," in conflict with the PRA's definition of Vice Presidential records, is far closer to the *Armstrong II* exception than are Plaintiffs' claims in this case.

In their Complaint, Plaintiffs try to use the alleged incident of the President taking possession of an interpreter's so-called "notes" as a hook to bring their claim within the *Armstrong II* exception, but this gambit gains them nothing, particularly when their assertion that the interpreter's notes qualify as a "federal record" within the meaning of the FRA is pure speculation. Plaintiffs' opposition brief largely abandons any reliance on that incident. Instead, Plaintiffs' brief seeks to focus on a broader notion that the President and his staff are "prevent[ing] agencies from creating and preserving records of their interactions with certain foreign leaders in violation of the FRA." Pl. Opp. at 20.

But this theory is untenable and does nothing to introduce a "classification" issue that would bring Plaintiffs' claims within the ambit of the *Armstrong II* exception. Although the FRA requires agencies to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions *of the agency*," 44 U.S.C. § 3101 (emphasis added), it imposes no obligation on agencies to create records documenting *the President's* activities. To the extent Plaintiffs' theory here can be understood, it seems to rely on the notion that, because the President allegedly refuses to include State Department employees (other than, on occasion, interpreters who assist the President with real-time translation during the meeting) as participants in his one-on-one meetings with foreign leaders, those State Department employees are unable to document the meetings. But neither the PRA nor the FRA requires State Department employees to document meetings at which they are not present and in which they play no substantive role. Plaintiffs' theory puts the cart before the horse by suggesting that the President's decisions about who should attend or participate in his meetings with foreign leaders should be driven by what recordkeeping obligations might thereby be triggered, rather than by the President's foreign policy strategy. This convoluted logic runs

straight into the President's authority "to speak and bargain effectively with other nations," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 382 (2000), and precludes judicial review on that basis alone.

Moreover, even under Plaintiffs' description, an official "note taker" might just as easily be an employee of the National Security Council ("NSC")—which is not subject to the FRA—as an employee of the State Department. *See* Compl. ¶ 64; Pl. Opp. at 9. Thus, even assuming— contrary to the D.C. Circuit's holding in *Judicial Watch Inc. v. U.S. Secret Serv.*, 726 F.3d 208 (D.C. Cir. 2013), *see* Def. Mem. at 19 n.10—that a State Department note taker whose role is to document a meeting between the President and a foreign leader would ultimately create a federal record rather than a Presidential record, an NSC note taker in the very same role would necessarily produce a Presidential, rather than a federal, record. Clearly then, nothing *requires* that any record created in this circumstance be a federal record. Plaintiffs' factual allegations thus raise no genuine FRA issue, nor any issue of improperly classifying federal records as Presidential records. The mere fact that Plaintiffs cite the FRA and baldly assert that the President has improperly "classified" federal records as Presidential records is insufficient to allow judicial review when their underlying allegations all concern supposed violations of 44 U.S.C. § 2203 and thus fall squarely within *Armstrong*'s bar.

Because Plaintiffs' claims expressly implicate the very type of Presidential decisionmaking that *Armstrong I* and *II* held is beyond the scope of judicial review, it does not matter that Plaintiffs purport to challenge a "policy and practice," Pl. Opp. at 16, rather than decisions regarding specific records. Importantly, the PRA analysis in *Armstrong II* did not distinguish between the President's general recordkeeping practices, on the one hand, and decisions regarding specific records, on the other. Rather, *Armstrong II* held that, as part of the President's "virtually complete control" over

Presidential records, "the President's recordkeeping *practices* and decisions" are exempt from judicial review, with the exception of any guidelines setting forth initial classification criteria. *Armstrong II*, 1 F.3d at 1290 (emphasis added).[3] Plaintiffs' extensive discussion of their "policy and practice" claim misses the mark entirely. Plaintiffs concede that they claim violations of 44 U.S.C. § 2203, which plainly fall within the *Armstrong* bar, and their claim fails to identify any initial classification guideline—even an unwritten one—that could implicate the *Armstrong II* exception. The Court therefore lacks subject matter jurisdiction over Plaintiffs' claims of PRA violations. Accordingly, this case should be dismissed in its entirety.

### B.     The Court Should Reject Plaintiffs' Invitation To Overrule *Armstrong I*

Recognizing that *Armstrong I* and *II* clearly require their claims' dismissal, Plaintiffs ask this Court to hold that *Armstrong I* was wrongly decided. *See* Pl. Opp. at 21, 39–45. The Court should reject this invitation. "[D]istrict judges, like panels of [the D.C. Circuit], are obligated to follow controlling circuit precedent until either [the Circuit], sitting en banc, or the Supreme Court, overrule[s] it." *Brookens v. Acosta*, 297 F. Supp. 3d 40, 47 (D.D.C. 2018) (quoting *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997)), *aff'd sub nom. Brookens v. Dep't of Labor*, No. 18-5129, 2018 WL 5118489 (D.C. Cir. Sept. 19, 2018); *see also Agostini v. Felton*, 521 U.S. 203, 207 (1997) ("[L]ower courts should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). *Armstrong I* and *II* directly control this case, as

---

[3] This is in contrast to the jurisprudence under the FRA, which in some circumstances has allowed challenges, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, to recordkeeping guidelines and directives, even though individual acts of noncompliance with such guidelines and directives are not reviewable. *Armstrong I*, 924 F.2d at 293; *CREW v. Pruitt* ("*Pruitt*"), 319 F. Supp. 3d 252, 260 (D.D.C. 2018). In other words, the PRA contains no general "guidelines and directives" or "policies and practices" exception to its implicit bar on judicial review. Rather, the *Armstrong II* exception applies only to guidelines that set forth initial classification criteria regarding what records qualify as "presidential." *Armstrong II*, 1 F.3d at 1290.

they expressly address the availability of judicial review over claims of PRA violations. And Plaintiffs point to no intervening Supreme Court or Circuit case that has overruled those decisions.

Rather, Plaintiffs' theory is that the D.C. Circuit did not take into account certain prior authority when reaching its decision in *Armstrong I*. *See* Pl. Opp. at 39. The fact that *Armstrong I* did not cite the decisions referenced by Plaintiffs does not mean that the court failed to consider them, nor that *Armstrong I* was wrongly decided. Neither of the cases that Plaintiffs cite addressed the availability of judicial review to consider the President's compliance with the PRA, and neither of them conflict with *Armstrong I*. In *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977), the Court considered a claim brought by former President Nixon, asserting that a statute that would require the GSA Administrator to take custody of and preserve his records, now that he was no longer in office, violated separation of powers principles. *See id.* at 439. The Court rejected his claim, largely because the statute merely required preservation of the materials at issue within the Executive Branch. *See id.* at 445. The Court's decision thus did not address the statutory provisions at issue here, purporting to impose recordkeeping requirements on a President while he is still in office. Nor did it address the availability of judicial review for private parties alleging that the President has violated such statutory provisions. The court in *Armstrong I* addressed both of those issues directly, in connection with claims brought by private parties challenging compliance with the very statute at issue here. The court's reasoning in that case is not only binding but persuasive, given the very different equities involved when it comes to review of a President's conduct while he is in office.

The Court's decision in *Youngstown Sheet & Tube Co.*, 343 U.S. 579 (1952), is even farther afield from the case here. That case held that an executive order directing the Secretary of Commerce to take possession of and operate privately-owned steel mills was an improper exercise

of legislative authority by the President. *See id.* at 588. Such a holding has no relevance here because, as discussed in further detail below in the section addressing Plaintiffs' Take Care Clause claim, the President's purported lack of compliance with a statute is in no way equivalent to an exercise of legislative authority.

Moreover, while Plaintiffs contend that the D.C. Circuit in *Armstrong I* misconstrued the PRA's legislative history, they point to nothing in the legislative history that suggests that Congress intended to subject the President to lawsuits by private parties based on an alleged failure to comply with the PRA. The legislative history that they do cite suggests the opposite, and is thus consistent with *Armstrong I.* For example, Plaintiffs recognize that Congress intended that Presidential records not be publicly available until after the President leaves office. Pl. Opp. at 44. But that intent would be undermined if the President were forced to present his records in court as evidence, in response to private lawsuits, establishing that his recordkeeping is adequate. Plaintiffs falsely equate judicial review with statutory compliance. Their assertion that Congress intended the President to comply with the PRA's provisions is undoubtedly true, but as *Armstrong I* stated, Congress did not intend to rely on the courts to enforce the President's compliance with the PRA's requirements, but instead "relied on the fact that subsequent Presidents would honor their statutory obligations." *Armstrong I*, 924 F.2d at 290. Plaintiffs identify no valid basis for the Court to find *Armstrong I* wrongly decided, even if it had the power to do so. The Court thus should reject Plaintiffs' invitation to overrule the D.C. Circuit and instead should dismiss this case as *Armstrong I* and *II* require.

## II.    PLAINTIFFS FAIL TO SHOW ENTITLEMENT TO MANDAMUS RELIEF

### A.    Plaintiffs Have Not Identified a Clear Right To Relief

Claim One of Plaintiffs' Complaint, seeking mandamus relief, should also be dismissed because Plaintiffs cannot establish the elements of mandamus jurisdiction. Plaintiffs fail to show that this case presents an "extraordinary situation[]" warranting the "drastic" remedy of mandamus relief. *See CREW*, 924 F.3d at 606. As explained in Defendants' opening brief, the D.C. Circuit's holding that judicial review is precluded for PRA claims like the ones here requires the conclusion that Plaintiffs have no clear right to relief. Plaintiffs largely ignore this glaring impediment to establishing the "clear right to relief" prong of mandamus jurisdiction and instead attempt to refute alternative arguments that the Court need not reach. However, those attempts also fail.

Plaintiffs' claimed "clear right to relief" boils down to an assertion that they have plausibly alleged that the President has violated the PRA by "refus[ing] to document his meetings with certain foreign officials." Pl. Opp. at 27. But that allegation is speculative rather than plausible. Indeed, Plaintiffs expressly concede in their Complaint that documentation of such meetings has occurred. *E.g.*, Compl. ¶ 40 (referencing a "readout" of a meeting between the President and Russian officials that was "released by the White House Office of the Press Secretary").

The only sources Plaintiffs identify for the notion that, despite such concessions, such meetings are *not* being documented are hearsay statements from unidentified individuals paraphrased in newspaper articles, but Plaintiffs mischaracterize and misrepresent the import of even those unauthoritative reports. For example, the January 2019 *Washington Post* article upon which Plaintiffs heavily rely states that then-Secretary of State Rex Tillerson "shared" with other officials a "readout" of the very 2017 meeting that Plaintiffs complain went undocumented due to

the President's alleged taking possession of an interpreter's notes.[4] Nothing in the PRA requires documentation of the President's activities simultaneously with their occurrence; rather, those activities can be documented afterwards. The far more plausible reading of the *Post* report is that documentation of the meeting did occur afterwards, based on then-Secretary Tillerson's readout, and any action by the President to take possession of the interpreter's so-called notes had nothing to do with that effort, but merely was done out of an abundance of caution to protect the meeting's confidentiality. Moreover, Plaintiffs' bald assertion in their brief that the interpreter's notes were "destroyed," Pl. Opp. at 28, is based on nothing at all, as they fail to cite even hearsay statements supporting such a claim, and they included no such allegation in their Complaint. "Confiscat[ing]" an interpreter's notes is not the same as destroying them, Compl. ¶ 42, nor is ripping up "papers" the same as destroying Presidential records, *id.* ¶ 68; *see also* Pl. Opp. at 28.

Even more egregiously, Plaintiffs filed a Motion for Temporary Restraining Order in this Court that sought to rely on a White House record memorializing a telephone call between the President and a foreign leader—a record that expressly refutes the plausibility of their underlying claim that no such records are being created. *See* Memorandum of Telephone Conversation (July 25, 2019), Pl. TRO Mem. ex.  B [ECF 16-2]. Even in the face of that direct contrary evidence, Plaintiffs sought to argue that they were likely to succeed in obtaining mandamus relief compelling the President to do what that record shows is already being done.

Plaintiffs also inexplicably discount the 2017 Memo requiring White House employees to

---

[4] *See* Greg Miller, Trump has concealed details of his face-to-face encounters with Putin from senior officials in administration, *Washington Post*, Jan. 13, 2019, available at https://www.washingtonpost.com/world/national-security/trump-has-concealed-details-of-his-face-to-face-encounters-with-putin-from-senior-officials-in-administration/2019/01/12/65f6686c-1434-11e9-b6ad-9cfd62dbb0a8_story.html.

comply with the PRA,[5] even though the D.C. Circuit has expressly recognized that that Memo does "just what the PRA requires" in directing White House staff to follow the PRA. *See CREW*, 924 F.3d at 607. Plaintiffs argue that the Memo is irrelevant here because, they say, the Memo cannot be enforced internally against the President. Pl. Opp. at 29. But Plaintiffs cite nothing suggesting that the PRA requires the President's activities to be documented by the President *himself*, and their descriptions of procedures supposedly followed in prior Administrations when Presidents met with foreign leaders show that the documentation of such meetings was *not* done by prior Presidents, but by their staff. Compl. ¶¶ 64–67. The 2017 Memo indisputably applies to White House staff.

Plaintiffs also fail to plausibly allege that the President is "defying" PRA requirements, see *CREW*, 924 F.3d at 606, simply based on his decisions regarding who should be present in his meetings with foreign leaders. As explained in Defendants' opening brief, Def. Mem. at 23, the President necessarily has "broad authority" when it comes to such meetings. *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 107 (D.C. Cir. 2018); *see Crosby*, 530 U.S. at 382. Plaintiffs argue that they are not asking the Court to impose limits on how the President interacts with foreign leaders, Pl. Opp. at 29, but in fact they are doing just that. They evidently seek to compel the President to include note takers at every meeting with a foreign leader, or to assign the role of note taker to interpreters who normally would not be carrying out such functions, but would be assisting the President with real-time translation. But a Court order imposing such a requirement would unquestionably interfere with the President's Article II authorities, particularly if the

---

[5] *See generally* Memorandum for All Personnel Regarding Presidential Records Act Obligations (Feb. 22, 2017), https://go.usa.gov/xEckn (National Archives).

President has determined that his negotiations would be most effective in a one-on-one meeting without note takers present.

Nothing in the PRA suggests that note takers' attendance at the President's meetings with foreign leaders is compulsory. The PRA requires adequate documentation of the President's official activities, but it does not dictate how or when such documentation should occur, nor does it specify what is necessary for such documentation to be "adequate." *See* 44 U.S.C. § 2203(a). Those determinations are left to the President, who in his discretion may take into account his broader foreign policy goals in such decisions. A mandamus claim seeking to enforce the PRA's recordkeeping provisions is not a proper vehicle for judicial interference in this sensitive area.[6]

Plaintiffs thus fail to plausibly allege that Defendants are "defying the law" with respect to the PRA. *See CREW*, 924 F.3d at 606. And the D.C. Circuit's conclusion in CREW applies equally here: Even if Plaintiffs' allegations can be read to raise "questions about 'what is actually

---

[6] Plaintiffs' TRO Motion suggested that the Court should take into account allegations set forth in a whistleblower complaint regarding the July 25, 2019 telephone call between the President and the President of Ukraine. Pl. TRO Mem. at 4–7. Contrary to Plaintiffs' assertions, those allegations do not implicate the PRA, which, as discussed below, imposes no restrictions on where records are stored, or how records are or are not disseminated to Executive Branch agencies. They therefore are entirely irrelevant to the claims asserted in this case—although the whistleblower complaint's reference to a record of the President's telephone call, and the White House's production of such a record, further undermine Plaintiffs' claim that no records of the President's meetings are being made, as noted above. Nor would it be appropriate for the Court to consider any ongoing evaluation by Congress of the substance of the President's meetings with foreign leaders, or to engage in any independent evaluation of such meetings, when determining the Court's subject matter jurisdiction over Plaintiffs' claims of alleged PRA violations. There is no indication that Congress intended the PRA as a vehicle for private parties to raise, or for courts to evaluate, substantive questions regarding a President's conduct during meetings with foreign leaders. Indeed, Plaintiffs concede that Congress did not view the PRA as a tool for allowing public access to information about the President's activities while he is in office; rather, the PRA was intended to ensure that Presidential records in existence at the end of a President's term would remain in government custody after the President leaves office. Pl. Opp. at 10. Such records may only become publicly available sometime after that. *See* Def. Mem. at 8.

happening in the White House,'" such "open questions" are "the antithesis of the 'clear and indisputable' right needed for mandamus relief." *CREW*, 924 F.3d at 608.

## B.      Plaintiffs Have Not Identified a Clear Duty To Act

As explained in Defendants' opening brief, the PRA does not impose ministerial duties that the Court could enforce, with respect to the President's creation of records of his meetings with foreign leaders and the PRA's other requirements. Def. Mem. at 23–25. To the contrary, to construe the PRA as imposing ministerial duties would be incompatible with the D.C. Circuit's recognition that the President has "virtually complete control" over records creation, management and disposal during his term in office. *Armstrong I*, 924 F.3d at 290. Plaintiffs concede that the PRA vests discretion in the President, but they argue this discretion is only "within limits." Pl. Opp. at 23. Neither *Armstrong* nor the language of the PRA supports their argument. Particularly in connection with the creation of records—the only genuine claim that Plaintiffs raise here[7]—the PRA clearly vests broad discretion in the President to determine what "steps . . . may be necessary" to ensure "adequate documentation," as well as what documentation is "adequate" in any given circumstance. 44 U.S.C. § 2203(a). These requirements cannot be considered ministerial, even

---

[7] Plaintiffs purport to raise claims regarding other supposedly ministerial duties, including "the duty to categorize records as presidential or personal," "the duty to comply with the PRA's notification procedures prior to destroying presidential records," and "the duty to implement record management controls." Pl. Opp. at 23 (citing Compl. ¶¶ 27, 32, 74). The PRA provisions cited by Plaintiffs fail to impose ministerial duties with respect to such actions. *See, e.g.*, 44 U.S.C. § 2203(a) (identifying "records management controls" simply as one means of ensuring adequate documentation, preservation, and maintenance of Presidential records); *id.* § 2203(b) (classifications of records as Presidential or personal only need occur "to the extent practicable" upon their creation or receipt); *id.* § 2203(c) (authorizing the President to dispose of certain records in certain circumstances). More importantly, however, Plaintiffs' Complaint does not include any allegations purporting to suggest that those provisions have been violated, nor does their opposition brief attempt to show that the President has "def[ied] the law," *CREW*, 924 F.3d at 606. with respect to those provisions.  Indeed, the 2017 Memo directly refutes the notion that no "record management controls" are in place.

"within limits." *Cf. Armstrong II*, 1 F.3d at 1294 ("any decisions regarding *whether to create* a documentary presidential record" are within the President's discretion and not subject to judicial review). The situation here is thus vastly different from those addressed in the cases cited by Plaintiffs, one of which involved alleged violations of the FRA rather than the PRA, *CREW v. EOP*, 587 F. Supp. 2d 48, 63 (D.D.C. 2008), and both of which involved alleged duties that were well defined, rather than dependent on the President's exercise of discretion, *see id.* (suggesting that mandamus would only be appropriate, if at all, with respect to "specific requirements" imposed by the FRA); *CREW v. Cheney*, 593 F. Supp. 2d at 220 (holding that although the obligations under 44 U.S.C. § 2203 were discretionary, the definition of Vice-Presidential records in 44 U.S.C. § 2201(2) imposed a ministerial duty to include all such records in any preservation efforts).

Moreover, Plaintiffs' allegations further highlight the non-ministerial nature of their demands. As described above, Plaintiffs concede that even the newspaper accounts that they cite indicate that records are being created. However, they appear to contend that those records are not always "adequate" because the newspapers suggest that the certain information was not included, or that the President's public representations were in conflict with the accounts of foreign leaders. *E.g.*, Compl. ¶¶ 41, 44, 45, 46–47. Plaintiffs even go so far as to suggest that the substance of a President's alleged statement in a telephone call to a foreign leader, which allegedly contradicted his advisers' advice, somehow implicates the PRA. *Id.* ¶ 56. The notion that the Court should evaluate what level of documentation is "adequate" in this context, or should police the content of the President's conversations, is troubling, to say the least, and surely does not support Plaintiffs' argument that they seek only to enforce ministerial duties.

Plaintiffs also contend that the President limits access by White House and other

government officials to information about his meetings. *E.g.*, *id.* ¶¶ 53, 55. In their TRO Motion, for example, Plaintiffs attempted to highlight allegations that records of meetings have been stored on a secure computer server, or have been retrieved from Executive Branch agencies. Pl. TRO Mem. [ECF 16] at 5–6, 7. But Plaintiffs point to nothing in the PRA purporting to regulate how the President shares or stores information during his term in office. In fact, the PRA imposes *no* duties on the President—ministerial or otherwise—in connection with the dissemination of records, sharing records with other government officials, or the locations where records are stored during his term in office. Such issues simply have nothing to do with the PRA.

Although, as noted, Plaintiffs raise no genuine claim regarding classification or disposal of records, Plaintiffs' concession that the President does have discretion over "*when* to categorize records," Pl. Opp. at 24, entirely undermines any such claim, as it shows that, even if there might be an obligation to classify records at some point before the President leaves office, no such ministerial obligation is in effect *now*. Any failure to classify records at this point therefore would not "defy[] the law," *CREW*, 924 F.3d at 606. Indeed, none of the provisions of 44 U.S.C. § 2203 specify *when* their described actions should be carried out, and Plaintiffs similarly concede that the prerequisite steps to records disposal, set forth in § 2203(c), could only be triggered *if* the President intends to "destroy presidential records." Pl. Opp. at 24. Plaintiffs fail to identify any intended disposal of records by the President, so their contention that the statute currently imposes a ministerial duty with respect to such disposal is untenable.

Plaintiffs' further concession that the President has "complete control" over "the disposition of particular documents while in office," also fails to bolster the notion that the PRA imposes ministerial duties in connection with records disposal, or any other aspect of records management. *See* Pl. Opp. at 25. Indeed, Plaintiffs reverse the applicable analysis by arguing that

"[b]ecause the President has a clear duty to act prior to destroying presidential records, it is a ministerial duty." *Id.* To the contrary, the "clear duty" prong can only be satisfied if a duty is not only "ministerial" but "peremptory" and "clearly defined." *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980). By its own terms, 44 U.S.C. § 2203(c) does not require the President to dispose of any records; any such disposal, and any accompanying prerequisites to such disposal, therefore is purely a matter of discretion. Plaintiffs thus fail to establish the "clear duty to act" prong of mandamus jurisdiction, and their mandamus claims accordingly should be dismissed.

### C.     Plaintiffs Fail To Show that Mandamus Relief Against the President Is Available

Above and beyond Plaintiffs' failure to establish the elements of mandamus jurisdiction, the Court lacks jurisdiction to issue a writ of mandamus against the President himself in order to compel his compliance with the PRA. As explained in Defendants' opening brief, no court has taken such a step. *See* Def. Mem. at 25–26. Plaintiffs claim that two Supreme Court cases have "upheld such relief," Pl. Opp. at 32, but they grossly mischaracterize both decisions. In *United States v. Nixon*, 418 U.S. 683 (1974), the Court did not grant mandamus relief compelling the President to comply with a statute; instead, it affirmed an order requiring submission for in camera review of material at issue in a motion to quash a subpoena. *See id.* at 715–16. The other case cited by Plaintiffs, *Boumediene v. Bush*, 553 U.S. 723 (2008), similarly does not grant injunctive relief against the President; rather, it held that Guantanamo detainees could pursue habeas relief. *See id.* at 795. Contrary to Plaintiffs' contention, the D.C. Circuit's holding in *Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010), that "courts do not have jurisdiction to enjoin [the President]," remains binding. *Id.* at 1013.

### III. PLAINTIFFS CANNOT ESTABLISH ENTITLEMENT TO DECLARATORY RELIEF

As explained in Defendants' opening brief, *see* Def. Mem. at 26–27, the Declaratory Judgment Act, 28 U.S.C. § 2201, does not confer subject matter jurisdiction but instead identifies declaratory relief as a potential remedy for claims that the Court already has the power to review. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Plaintiffs' Claims Two, Three, and Four, seeking declaratory relief based on the same theories that they assert in Claim One, therefore cannot proceed independently. While the Court lacks subject matter jurisdiction over all Plaintiffs' claims due to the PRA's preclusion of judicial review, the Court's lack of mandamus jurisdiction over Claim One provides an additional reason that Claims Two, Three, and Four should also be dismissed. Plaintiffs concede this well-settled rule and thus agree that their Claims Two, Three, and Four are entirely dependent on the Court's jurisdiction to consider Claim One. Pl. Opp. at 34–35. Accordingly, the Court should dismiss Claims Two, Three, and Four for the same reasons that Claim One should be dismissed.

### IV. PLAINTIFFS HAVE NO VALID CLAIM UNDER THE TAKE CARE CLAUSE

Plaintiffs' final claim, Claim Five, repackages the same assertions yet again, this time as a purported violation of the Constitution's Take Care Clause. As Defendants have explained, no court has allowed a plaintiff to circumvent jurisdictional limitations on other causes of action asserting statutory violations simply by invoking the Take Care Clause. Such a theory would turn every statutory claim into a constitutional challenge and eviscerate fundamental prerequisites to judicial review, such as a private right of action and the absence of a statutory preclusion. Def. Mem. at 27–29.

Plaintiffs have no cogent response to these obvious flaws in their claim. Rather, they assert that there is such a thing as nonstatutory review. Pl. Opp. at 35–36. Of course, courts discussing

nonstatutory review emphasize that, "while such review may be available, it is quite narrow," and "is available only to determine whether [an] agency has acted 'ultra vires'—that is, whether it has 'exceeded its statutory authority.'" *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 307–08 (D.C. Cir. 2014). But Plaintiffs make no attempt here to assert that the President is acting ultra vires, nor could they, given that, as relevant here, the President's authority to conduct meetings with foreign leaders does not derive from statutes in the first place, but from Article II of the Constitution. The PRA also does not delegate authority to the President to create or maintain records of his activities; rather, the President already had that authority, and the PRA simply sets forth standards for exercising it, with the goal of preserving Presidential records after the President leaves office. Plaintiffs' argument regarding nonstatutory review therefore is beside the point and does nothing to advance their assertions regarding the Take Care Clause.

Plaintiffs also point to cases that have considered whether an Executive action impermissibly encroached on Legislative functions. *See NLRB v Canning*, 573 U.S. 513, 557 (2014) (holding President's recess appointments to NLRB were not authorized by the Recess Appointments Clause); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1330–31 (D.C. Cir. 1996) (holding that nonstatutory review was available to consider whether an executive order exercising procurement power that Congress had delegated through the Procurement Act conflicted with a statute but recognizing that relief would not be available against the President); *United States v. Juarez-Escobar*, 25 F. Supp. 3d 774, 776 (W.D. Pa. 2014) (considering whether an executive order was an impermissible exercise of legislative rather than executive power). But none of those cases involved claims seeking affirmative relief against the President under the Take Care Clause. Indeed, the President was not a defendant in these cases. For example, *Juarez-Escobar* was a criminal case, where the court cited the Take Care Clause simply to illustrate the unremarkable

principle that the Constitution confers executive rather than legislative powers on the President. *See id.* ("The President may only 'take Care that the Laws be faithfully executed . . .'; he may not take any Executive Action that creates laws."). Plaintiffs' assertion that their claims address "unilateral legislative action[s]" because the President's alleged PRA violations actually amount to "chang[ing] the relevant statutes," Pl. Opp. at 37, is nonsense. Even if Plaintiffs had plausibly asserted that the President failed to keep records in a certain category in violation of the PRA, such a failure cannot fairly be considered an amendment of a statute. Under Plaintiffs' theory, every statutory violation would actually be a statutory amendment, particularly if repeated. But no court has held, for example, that a repeat bank robber has effectively amended the federal law prohibiting bank robbery.

In sum, while Plaintiffs make half-hearted attempts to distinguish cases cited in Defendants' opening brief, they fail to overcome the fact that no court has recognized a cause of action under the Take Care Clause. On the other hand, courts have repeatedly recognized that judicial review of the President's discretionary acts, or of his compliance with the PRA is unavailable. Indeed, despite Plaintiffs' contrary assertion, the holding in *Dalton v. Specter*, 511 U.S. 462 (1994), that judicial review of discretionary Presidential decisions "is not available," *see id.* at 474–75, is directly on point here. As the D.C. Circuit held in *Armstrong*, the President retains virtually complete control over the creation, management, and disposal of Presidential records during his term in office, and the PRA precludes judicial review over his exercise of that authority. Claim Five therefore should be dismissed.

## **CONCLUSION**

For the foregoing reasons and those set forth in Defendant's opening brief, the Court should dismiss Plaintiffs' claims in their entirety, with prejudice.

Dated:  October 17, 2019                    Respectfully submitted,

                                            JOSEPH H. HUNT
                                            Assistant Attorney General
                                            MARCIA BERMAN
                                            Assistant Director, Federal Programs Branch

                                            */s/ Kathryn L. Wyer*
                                            KATHRYN L. WYER
                                            Federal Programs Branch
                                            U.S. Department of Justice, Civil Division
                                            1100 L Street, N.W., Room 12014
                                            Washington, DC  20005
                                            Tel. (202) 616-8475 / Fax (202) 616-8470
                                            kathryn.wyer@usdoj.gov
                                            *Attorneys for Defendants*