**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, *et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, *et al.*,

Defendants.

Civil Action No. 19-1333 (ABJ)

**MEMORANDUM OPINION**

Three organizations, Citizens for Responsibility and Ethics in Washington ("CREW"), the National Security Archive ("NSA"), and the Society for Historians of American Foreign Relations ("SHAFR"), have brought this lawsuit against President Donald J. Trump, in his official capacity, and the Executive Office of the President ("EOP"). The complaint alleges that the defendants violated the Presidential Records Act ("PRA"), the Federal Records Act ("FRA"), and the Take Care Clause of the Constitution when the President and his staffers failed to create, maintain, and properly dispose of records of interactions with foreign leaders. Compl. [Dkt. # 1] at 1–2. Plaintiffs seek relief in the form of a writ of mandamus and an injunction compelling defendants to comply with their duties under the PRA, as well as a declaration that defendants' actions have been in violation of the PRA, FRA, and the Take Care Clause. *Id*. at 37–38.

On August 9, 2019, defendants moved to dismiss the complaint for lack of jurisdiction and for failure to state a claim. Since the Court is bound by Circuit precedent to find that it lacks authority to oversee the President's day-to-day compliance with the statutory provisions involved

in this case, the motion to dismiss will be granted. Thus, this opinion will not address, and should not be interpreted to endorse, the challenged practices; nor does it include any finding that the Executive Office is in compliance with its obligations.

**BACKGROUND**

## I. Statutory Framework

The creation, maintenance, and disposal of records created by the federal government are controlled by two key statutes: The Presidential Records Act ("PRA") and the Federal Records Act ("FRA").

The PRA governs the management of "presidential records." 44 U.S.C. § 2201 *et seq.*; *see Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282, 285–86 (D.C. Cir. 1991). The statute defines "presidential records" as:

> [D]ocumentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

§ 2201(2). The Act expressly excludes two sets of materials from the definition of Presidential records: any materials that qualify as "official records of an agency (as defined in [the Freedom of Information Act, 5 U.S.C. § 552(f)][1])," § 2201(2)(B); and "personal records," that is, materials "of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." §§ 2201(2)(B), (3).

1 Although section 2201(2)(B) of the PRA refers to subsection (e) of the Freedom of Information Act, that subsection has been recodified at 5 U.S.C. § 552(f).

With respect to the records that are covered, the Presidential Records Act provides:

> [T]he President shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law.

§ 2203(a). During a President's term, "the President may dispose of those Presidential records of such President that no longer have administrative, historical, informational, or evidentiary value . . . ." § 2203(c). Prior to doing so, though, the President must obtain the views of the Archivist of the United States concerning the records the President proposes to destroy. § 2203(c)(1). The Archivist may, and in some situations shall, notify Congress of the intended destruction, and the President must wait at least sixty days after such notification to destroy the records. §§ 2203(d), (e). But "[t]he PRA gives neither the Archivist nor the Congress the authority to veto the President's decision to destroy the records." *Armstrong I*, 924 F.2d at 286. The PRA permits the Archivist to maintain and preserve Presidential records on behalf of the President, but the statute states that "[t]he President shall remain exclusively responsible for custody, control, and access" to those records. 44 U.S.C. § 2203(f). Upon the conclusion of the President's term, the Archivist assumes responsibility of the Presidential Records. § 2203(g)(1).

The Federal Records Act, by contrast, governs the management of agency records. 44 U.S.C. § 2101 *et seq.*; *Armstrong I*, 924 F.2d at 284. The FRA defines "records" as materials "made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government . . . ." § 3301(a)(1)(A).

The FRA directs the head of every federal agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency . . . ." § 3101. Each agency head must also "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency" and must "establish safeguards against the removal or loss of records . . . ." §§ 3102, 3105. Agency records may not be destroyed except as outlined in the FRA. § 3314.

## II. Procedural Background

Plaintiffs filed their complaint on May 7, 2019, alleging that the President and the Executive Office of the President have violated the PRA and the FRA by failing to create, preserve, and properly dispose of records of meetings and discussions with foreign leaders. *See* Compl. at 1–2. The complaint seeks the following relief:

- Claim One: a writ of mandamus "ordering the President, his staff, and the EOP to comply with their mandatory, non-discretionary duties under the PRA";

- Claim Two: "a declaratory judgment that President Trump, his staff, and the EOP have violated their non-discretionary statutory duties under the PRA," through "a policy and practice of repeatedly failing and/or affirmatively refusing to create records of their meetings and conversations with foreign leaders";

- Claim Three: "a declaratory judgment that the Defendants' directives that the Department of State not create or maintain records of the [P]resident's bilateral meetings with certain foreign heads of state and the President's assertion of unilateral and exclusive control over the contents of meetings . . . with foreign leaders violate the PRA and the FRA";

- Claim Four: a declaratory judgment that the defendants violated the PRA by failing to obtain the Archivist's written views and to transmit a disposal schedule to Congress prior to disposing of a Presidential record; and

- Claim Five: a declaratory judgment that the President's failure to comply with the PRA, and his interference with the State Department's

> compliance with the FRA, are contrary to law and a violation of his constitutional obligation to take care that the law be faithfully executed, as well as an injunction ordering compliance with those obligations in the future.

Compl. ¶¶ 72–106.

On August 9, 2019, defendants moved to dismiss the complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted under Rule 12(b)(6). They argue that the PRA precludes judicial review of the President's recordkeeping practices and decisions; that Count One fails to point to the clear duty to act that is necessary for mandamus jurisdiction; that the requests for declaratory relief also fail in the absence of a judicially remediable right; and that plaintiffs are not entitled to relief under the Take Care Clause of the Constitution. Defs.' Mot. to Dismiss [Dkt. # 11] ("Defs.' Mot.") at 11–29. On September 13, 2019, plaintiffs opposed the motion. Pls.' Opp. to Defs.' Mot. [Dkt. # 14] ("Pls.' Opp.").[2] Defendants replied on October 17, 2019. Defs.' Reply in Support of Defs.' Mot. [Dkt. # 20]. Both parties filed supplemental briefs on December 5, 2019. Defs.' Suppl. Br. [Dkt. # 21] ("Defs.' Suppl. Br."); Pls.' Suppl. Br. [Dkt. # 22] ("Pls.' Suppl. Br.").

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(1), the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113

---

2 A few weeks after defendants filed their motion to dismiss, plaintiffs filed a motion for a temporary restraining order, asking the Court to order defendants to preserve certain categories of documents pending the litigation. Pls.' Mot. for Temporary Restraining Order [Dkt. # 15]. On October 2, 2019, defendants filed a notice with the Court, representing that they would preserve those documents. Defs.' Notice [Dkt. # 19]. The Court then denied the motion for temporary restraining order as moot and ordered defendants to preserve the categories of documents identified by plaintiffs. Min. Order (Oct. 3, 2019).

(D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005).   Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.   *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).   Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").   "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'"   *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).   Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert*

*v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

**ANALYSIS**

**I. The complaint will be dismissed for lack of jurisdiction.**

The defendants have moved to dismiss the entire complaint based on the holding in *Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282, 291 (D.C. Cir. 1991), that "the PRA precludes judicial review of the President's recordkeeping practices and decisions." While ordinarily there is a presumption favoring judicial review of executive action under a statute, that presumption may be overcome by an express prohibition in the legislation, or, if a court finds based on an analysis of the statute's structure, objectives, legislative history, and the nature of the administrative action involved, that such a bar was implied. *Id.* at 290. Considering those factors, the D.C. Circuit held in 1991 that the Presidential Records Act is "one of the rare statutes that . . . impliedly precludes judicial review." *Id.*

The *Armstrong I* opinion reviews the legislative history of the PRA and reports that the purpose of the statute was to ensure that presidential records would be preserved so that the public could have access to them after the President left office. *Id.* At the same time, the Court observed, Congress "sought assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive branch control over presidential records during the President's term in office." *Id.* And the Court concluded that the absence of any language creating a private right of action was consistent with that aim. *Id.* The opinion reasoned that "permitting judicial review of the President's compliance with the PRA would upset the intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns." *Id.*

Since the "PRA accords the President virtually complete control over his records during his term of office," *id.*, and it grants neither the Archivist nor Congress any authority to interfere with the executive's recordkeeping activities, the *Armstrong I* Court found that Congress did not intend to allow courts, "at the behest of private citizens, to rule on the adequacy of the President's records management practices or overrule his records creation, management, and disposal decisions." *Id.*[3]

As plaintiffs point out, though, the D.C. Circuit carved out an exception to the holding in *Armstrong I* when it announced in a subsequent opinion that "courts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA." *Armstrong v. Exec. Office of the President* ("*Armstrong II*"), 1 F.3d 1274, 1290 (D.C. Cir. 1993); Compl. at 30. In *Armstrong II*, the Court reversed a district court decision "declining to review the EOP guidelines defining Presidential records," and it ruled that a court may do so "for the limited purpose" of ensuring that the rules did not encompass materials that would otherwise be subject to the Freedom of Information Act. *Armstrong II*, 1 F.3d at 1290. The Court cautioned that "[t]he PRA does not bestow on the President the power to assert sweeping authority over whatever materials he chooses to designate as presidential records without any possibility of judicial review." *Id.*

In reaching this decision, the Court confirmed its clear holding in *Armstrong I* that "[t]he PRA delineates those records over which the President may exercise 'virtually complete control'. . . , and the courts may not restrict that control by reviewing the President's recordkeeping practices and decisions." *Id.* But it explained that the bar on judicial review

3 The Court chose not to second-guess the judgment made by the legislature, *id.* at 291, when it "presumably relied on the fact that subsequent Presidents would honor their statutory obligations to keep a complete record of their administrations." *Id.* at 290.

shields only the "creation, management, and disposal decisions" of the President and not "the initial classification of existing materials." *Id.* at 1294.

The D.C. Circuit has continued to adhere to this distinction. In *Citizens for Responsibility & Ethics in Wash. v. Trump* ("*CREW v. Trump*"), the Court again differentiated the review of Presidential guidelines governing the implementation of PRA – in particular, the classification of records as "presidential" – from the review of executive practices or actions that may have contravened either the PRA or those guidelines. 924 F.3d 602 (D.C. Cir. 2019).[4] In that case, plaintiffs CREW and the National Security Archive complained that White House personnel were reportedly communicating through a messaging application that automatically deleted messages as soon as they are read. *Id*. at 603. They alleged that the use of the application violated the PRA because it effectively exempted an entire class of records from the statutory regime. *Id*. at 609. The lawsuit sought a declaratory judgment that use the application and similar applications violated the PRA and a writ of mandamus compelling the President and the Executive Office to adopt procedures and guidelines that comported with the law. *Id.* at 603, 610. But the D.C. Circuit found that it did not have the power to get involved. *Id.*

The Court ruled that under *Armstrong I* and *Armstrong II*, it lacked jurisdiction to order the executive to take corrective action, and therefore, the plaintiff could not show the clear and indisputable right to relief that is the prerequisite for a writ of mandamus. *Id.* at 608–10. The Court also took judicial notice of a 2017 White House Memorandum that reminded all personnel of their obligations under the PRA. *Id.* at 607–08. The Court held that the Memorandum itself was consistent with the PRA, and that it could not police whether the White House was

---

4 *See also id.* at 609, quoting *Armstrong II*, 1 F.3d at 1294 (reiterating that a court could review "whether the Executive's definition of 'presidential records' subverts FOIA by labeling as 'presidential' those federal records that are otherwise subject to immediate public release" and "guidelines outlining what is, and what is not, a 'presidential record'").

complying with its own policy, *id.* at 608; determining whether White House personnel were "in fact complying with the directive to conduct all work-related communication on official email would require just the kind of micromanaging proscribed by *Armstrong I*." *Id.* at 609.

*CREW v. Trump* did reiterate that the courts have "authority to 'review guidelines outlining what is, and what is not, a 'presidential record.'" *Id.*, quoting *Armstrong II*, 1 F.3d at 1294. But the opinion makes clear that when applying the *Armstrong* precedents, a district judge must steer clear of efforts to supervise day-to-day operations within the White House, *id.*, even when a complaint presents legitimate concerns about an ongoing practice that threatens the preservation of, and public access to, presidential records.

Citing those principles, defendants have moved to dismiss all of plaintiffs' claims for lack of jurisdiction. Defs.' Mot. at 11–19. A review of the allegations in the complaint reveals that in each claim, plaintiffs are indeed questioning the President's "record management practices" and his "creation, management, and disposal decisions," and therefore, *Armstrong I* requires that the motion to dismiss be granted.[5]

In their complaint, plaintiffs emphasize the particular importance of the creation and retention of records of the Chief Executive's meetings with foreign leaders, *see, e.g.*, Compl. ¶¶ 6, 39, 53, and they point to a number of news accounts that give rise to concerns that those records are not being generated or are being destroyed. *See id.* ¶ 7. They also allege that these "recordkeeping failures apparently extend to other White House officials." *Id.* ¶ 8.

In particular, plaintiffs allege:

---

5 Plaintiffs argue that *Armstrong I*, to the extent it supports defendants' motion, was wrongly decided, because it conflicts with the Supreme Court's decisions in *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977) and *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), and it relied on a flawed analysis of the Congressional intent underlying the PRA. *See* Pls.' Opp. at 39–45. But this Court is bound by Circuit precedent unless and until the Court of Appeals revises its decision or the decision is overruled.

- "In May 2017, notable discrepancies appeared between the official readout of the President's meeting with Russian diplomats and reports that emerged later." Compl. ¶ 40.

- "In July 2017, President Trump had his first reported face-to-face meeting with President Putin in Hamburg, Germany during the G-20 Summit. Reportedly, President Trump confiscated his interpreter's notes after the meeting and ordered the interpreter not to disclose to anyone what he had heard, including administration officials . . . . The interpreter for that summit . . . was an employee or contractor of the State Department . . . ." Compl. ¶ 42.

- "During a dinner that followed, President Trump had a conversation with President Putin without any accompanying American witnesses." Compl. ¶ 45.[6]

- "Presidents Trump and Putin also chatted informally a number of times during the November 2017 Asia-Pacific Economic Cooperation Summit in Da Nang, Vietnam[,]" but "reportedly no official transcript or notes of their 'sidelines' meetings in Vietnam exist." Compl. ¶ 48.

- "On July 16, 2018, President Trump held a much-heralded summit with President Putin in Helsinki, Finland. During their two-hour private meeting the two were accompanied only by interpreters. . . . Reportedly President Trump's interpreter left the meeting 'with pages of notes,' . . . but there is no indication those notes have been shared with anyone." Compl. ¶¶ 49–51 (citation omitted).

- "President Trump's fifth meeting with President Putin took place in Buenos Aires, Argentina in November 2018 during another G-20 Summit. Like his second meeting with President Putin in Germany, President Trump conducted the conversation without anyone else from the U.S. present beyond his wife – no translator, no note-taker, and no official member of his delegation." Compl. ¶ 52.

- "More recently, President Trump met with North Korean leader Kim Jong-Un in Hanoi, Vietnam, at a critical second nuclear summit. In a highly unusual move, the only other individuals present for their meeting were interpreters, who were not there to create a record of the conversation, with note takers again banned from the meeting, leaving

6 The complaint also alleges that after these meetings, President Trump purported to summarize the meetings in several tweets, but that "Russian officials . . . provided an 'alternative account.'" Compl. ¶¶ 46–47 (citation omitted).

U.S. policymakers in the dark about what transpired and leaving no historical record." Compl. ¶ 57.

- Senior White House Advisor Jared Kushner met in Saudi Arabia with Crown Prince Mohammed bin Salman and King Salman, and "[r]eportedly U.S. embassy staff in Riyadh 'were not read in on the details of [his] trip … or the meetings he held with members of the country's Royal Court[.]'" Compl. ¶ 60 (citation omitted).

- "Beyond these recordkeeping failures, President Trump and his White House have ignored other obligations the PRA imposes. For example, notwithstanding his preservation obligations, President Trump had and may still have a habit of ripping up papers when he was done with them, which some described as 'his unofficial filing system.'" Compl. ¶ 68 (internal quotation marks and citation omitted).

- "Further, Jared Kushner reportedly uses an encrypted message service, WhatsApp, as well as a personal email account to conduct official business, including to communicate with Saudi Crown Prince Mohammed bin Salman." Compl. ¶ 69.

Plaintiffs also assert that "[t]his policy and practice by President Trump and other top White House officials like Jared Kushner of failing and/or refusing to create or preventing others from creating records of their meeting with foreign leaders . . . deviates sharply from the protocols and practices of prior administrations." Compl. ¶ 62; *see id*. ¶¶ 63–67.

All of the claims incorporate these facts, and on that basis, Claim One seeks a writ of mandamus compelling compliance with the PRA. Compl. ¶¶ 72, 78. It alleges that President Trump, personally and through his staff, has violated his statutory obligations

> by engaging in a policy and practice of refusing to create records of his meetings and conversations with foreign leaders; by seizing interpreter's notes, which are agency records, and effectively classifying them as presidential records; by asserting unilateral and exclusive control over the contents of meetings by the President and his staff with foreign leaders; by maintaining recordkeeping policies, guidelines, and practices that improperly classify agency records as presidential records; and by destroying or ordering the disposal of presidential records without obtaining the Archivist's views in writing or producing a disposal schedule to Congress as the PRA requires.

Compl. ¶ 76. Claim Two similarly alleges that the President and his staff "have a policy and practice of repeatedly failing and/or affirmatively refusing to create records of their meetings and conversations with foreign leaders in violation of their mandatory, non-discretionary legal obligations to create records . . . ," *id.* ¶ 81, and it seeks declaratory and injunctive relief.

The language used in both claims, and the nature of the factual allegations they incorporate, make it plain that plaintiffs are challenging this administration's recordkeeping practices – its operational decisions concerning the creation and maintenance of records. The gravamen of these claims is that there appears to be a deliberate, ongoing effort to avoid the recordkeeping contemplated by Congress – at least with respect to a critical subset of foreign relations activities.[7] But plaintiffs' mere invocation of the word "policy" is not enough to relieve the parties of the jurisdictional bar recognized in *Armstrong I* or to bring these claims within the ambit of the narrow and specific *Armstrong II* exception. Adding a conclusory allegation that these practices, in effect, "improperly classify agency records as presidential records" does not change the outcome either; if the Court of Appeals rejected CREW's attempt to cast the intentional, regular use of an application that ensured the deletion of an entire set of communications between aides as a reviewable "classification" decision covered by *Armstrong II*, *CREW v. Trump*, 924 F. 3d at 609, then this Court is constrained by that precedent to reject a

7 In their opposition to the motion, plaintiffs describe their claims as a challenge to a presidential "policy and practice" of disposing of documents and refusing to create documents that would fall under the *Armstrong II* exception. Pls.' Opp. at 19–20. But the *Armstrong II* holding is not sufficiently broad to permit judicial review of all presidential recordkeeping practices, even if they are alleged to be repeated or ongoing. Rather, *Armstrong II* was narrowly confined to the review of policies and guidelines issued by the administration governing the initial classification of documents as presidential records subject to the PRA and the President's control.

similar attempt here.[8] Plaintiffs allege that Congress itself has expressed grave concerns about the practices at issue, *see* Compl. ¶ 58, but it is Congress that has the power to revisit its decision to accord the executive such unfettered control or to clarify its intentions if they were mischaracterized by the Court of Appeals.

Claim Three asserts that "[t]he classification by the President (or his staff and the EOP) of records created by employees of the Department of State as presidential records contravenes both the PRA and FRA." Compl. ¶ 86. It maintains that "the President's assertion of unilateral and exclusive control over the contents of meetings . . . with foreign leaders" – as opposed to the *records* of those meetings – violates the PRA and the FRA. *Id.* ¶ 87. The claim alleges, upon information and belief, that individuals who provide interpretation or translation services at the President's bilateral meetings with heads of state are State Department employees. *Id*. ¶ 89. It asserts that State Department officials are not only bound to preserve agency records, but that they "are charged with creating and transmitting records of the meetings and conversations the President and his staff have with foreign heads of state." *Id*. ¶ 90. "Accordingly," plaintiffs reason, "the records that those State Department employees create while providing interpretation or translation services to President Trump and those records they create memorializing the

8 It is also important to note that the writ of mandamus sought in Claim One is a "drastic" remedy, "to be invoked only in extraordinary situations." *Allied Chem. Corp. v. Daiflon, Inc*., 449 U.S. 33, 34 (1980). To support a mandamus petition, "a plaintiff must demonstrate (1) a 'clear and indisputable right to relief,' (2) that the government official has a 'clear duty to act,' and (3) that 'no adequate alternative remedy exists.'" *CREW v. Trump*, 924 F.3d at 606, quoting *American Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). In *CREW v. Trump*, the Court of Appeals found that in light of the statutory bar on judicial review announced in *Armstrong I*, the plaintiff had no "clear and indisputable right to [mandamus] relief[.]" 924 F.2d at 609–10. The Court then dispensed with the claims for equitable relief in a single sentence: "[f]or the same reasons that we decline to 'resort to mandamus' to micromanage the President's day-to-day compliance with the PRA, we shall 'not entertain [a claim] for declaratory relief.'" *Id.* at 610, quoting *Cartier v. Sec'y of State*, 506 F.2d 191, 200 (D.C. Cir. 1974). This indicates that Claims One and Two fall together, and it poses problems for Claims Three through Five as well.

President's meetings and conversations are agency records for the purposes of the FRA . . . ." *Id.* ¶ 91. Claim Three seeks a declaration that the President and the EOP violated both the PRA and the FRA.

At first blush, it would appear that Claim Three comes closer to articulating a claim that survives *Armstrong I*, but a careful reading reveals that what differentiates the claim from the others is merely the addition of a number of legal or summary assertions; in the end, Claim Three is based on the same set of facts, and the conclusions a party advances based on those facts cannot supply the missing basis for a claim.

There is no factual allegation in the complaint that anyone in the White House has actually "classified" a record of a meeting with a foreign leader as a presidential record, much less, that there is a general classification guideline or policy concerning records of meetings with heads of state in place for the Court to review.[9]   Like Claims One and Two, this count directs the Court's attention to instances of the President's operations under, and implementation of,

---

9       The heading of Claim Three makes it clear that the reclassified "records created by employees of the Department of State" to which it pertains, *see* Compl. ¶ 86, are interpreter notes: "For a Declaratory Judgment that the President's Classification of Interpreter Notes as Presidential Records and His Assertion of Unilateral and Exclusive Control Over the Contents of Meetings by the President and His Staff With Foreign Leaders Violate the Presidential Records Act and the Federal Records Act." Compl. at 33. Plaintiffs suggest in their opposition that when he confiscated an interpreter's notes on one occasion, the President promulgated a "policy" which improperly reclassified a State Department record as a presidential record subject to his control. *See* Pls.' Opp. at 28. They argue that "presidential recordkeeping policies of the White House are what the President – who is at the top of the decision-making chain and expressly charged by statute to implement the PRA – says they are." *Id*. at 19.
        The *Armstrong II* exception does permit a court to "review *guidelines* outlining what is, and what is not, a 'presidential record' under the terms of the PRA," 1 F.3d at 1290 (emphasis added), and the D.C. Circuit acknowledged that such a guideline may be oral and not reduced to writing. *Id.* But the complaint does not allege that the President has made any pronouncements on this issue, or that he has directed that other notes be seized or that they be treated as records under the PRA. Standing alone, plaintiffs' conclusory allegation that a policy exists is not enough to overcome a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S.662, 678 (2009).

"the entire federal recordkeeping regime." Compl. ¶ 92. It focuses in particular on the creation of records, and plaintiffs cannot point to factual allegations that satisfy their obligation to establish the existence of subject matter jurisdiction.

Claim Four, like Claim Three, addresses interpreters' notes, and it alleges that "President Trump has disposed of presidential records without first obtaining the views of the Archivist in writing and transmitting a disposal schedule to Congress prior to disposing of the record." Compl. ¶ 97. This count – based on the single incident described in the complaint concerning an interpreter's notes, *id.* ¶ 42[10] – cannot be viewed as anything other than a challenge to the President's day-to-day management of his records under the PRA.

Claim Five is brought against the President alone. It is nominally predicated on the Take Care Clause of the Constitution, but it specifically alleges that "[t]he failure of President Trump, his staff, and the EOP to create and maintain records . . . contravenes Congress' core purposes in enacting the PRA . . . ." Compl. ¶ 100. It alleges that the President violated his duty to take care that laws be faithfully executed "by directing or causing violations of the PRA and FRA." *Id.* ¶ 102. The claim seeks a declaratory judgment that his failure to "create and preserve records" in accordance with these statutes has been unlawful, as well as an injunction compelling him to comply with those particular laws in the future. *Id.* ¶¶ 105–06.

In other words, Claim Five simply repeats the statutory violations alleged in Claims One through Four, but it repackages them as a constitutional claim in an apparent effort to avoid the

---

10 Indeed, in the article cited in the complaint, the reporter acknowledged that he had no information that would indicate on whether the President had taken similar actions on other occasions. *See id.*, citing Greg Miller, *Trump has concealed details of his face-to-face encounters with Putin from senior officials in administration*, Wash. Post, (Jan. 13, 2019, 8:30 AM), https://www.washingtonpost.com/world/national-security/trump-has-concealed-details-of-his-face-to-face-encounters-with-putin-from-senior-officials-in-administration/2019/01/12/65f6686c-1434-11e9-b6ad-9cfd62dbb0a8_story.html.

strictures of *Armstrong I*. But "clever drafting of a complaint" or "artful pleading" is not a means to circumvent the preclusion of judicial review. *See Steadman v. Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963, 967–68 (D.C. Cir. 1990) (finding that the plaintiffs could not bypass the administrative exhaustion requirements of the Civil Service Reform Act of 1978 ("CSRA") by merely recasting prohibited personnel actions that fall under CSRA as constitutional violations).[11]

In sum, the complaint as a whole asks the Court to do precisely what it is precluded from doing: to review the "day-to-day operations" of the White House concerning presidential records, including "the adequacy of the President's records management practices or . . . his records creation, management, and disposal decisions." *Armstrong I*, 924 F.2d at 290; *see also Armstrong II*, 1 F.3d at 1294 ("[C]ourts may not review any decisions regarding *whether to create* a documentary presidential record[,] . . . the day-to-day process by which presidential records are maintained[, or the] dispos[al] of presidential records.") (emphasis in original). Therefore, the complaint will be dismissed.

## II. In the absence of a clear statutory mandate, plaintiffs have not satisfied the requirements for mandamus jurisdiction, and the Court is not empowered to issue declaratory or injunctive relief.

To the extent that any claims touch upon practices or decisions that arguably fall outside of the boundaries of the *Armstrong I* decision, there is another fundamental flaw with plaintiffs' request that the Court enjoin the President to perform his legal obligations: the law is clear that the Court cannot order the President to perform discretionary duties.

11 Defendants argue that Claim Five should be dismissed under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1) because "no court has ever held that the Take Care Clause can be used as a mechanism to obtain affirmative relief against the Executive." Defs.' Mot. at 27. The Court need not address the scope of the Take Care Clause, since it finds that it does not have jurisdiction to review the President's compliance with the PRA or to enjoin a sitting President to perform discretionary duties.

While the question of whether the Court has the power to compel the President to perform a purely ministerial duty may remain unsettled, *see Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992),[12] the law is clear that the Court cannot issue such relief to require performance of official duties that are *not* ministerial. *Id.* at 826 (Scalia, J., concurring in part and concurring in the judgment) ("[N]o court has authority to direct the President to take an official act."), *see id.* at 802, citing *Mississippi v. Johnson*, 71 U.S. (4. Wall.) 475, 499–501 (1866) (holding that the President's duties under the Reconstruction Act were not purely ministerial, and so the Court had "no jurisdiction of a bill to enjoin the President in the performance of his official duties").

In *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996), the D.C. Circuit cited the plurality opinion in *Franklin* and reiterated that a court does not have jurisdiction to enjoin the President in his discretionary duties. It also observed that "similar considerations . . . apply to [a] request for a declaratory judgment." *Id.* at 976 n.1; *see also Newdow v. Roberts*, 603 F.3d 1002,

---

12 Prior to *Franklin*, the D.C. Circuit concluded in two opinions that a court *may* issue a writ of mandamus compelling the President to perform ministerial duties. But it did not do so in either case, citing the "the utmost respect [for] the office of the Presidency and to avoid, if at all possible, direct involvement by the Courts in the President's constitutional duty faithfully to execute the laws and any clash between the judicial and executive branches of the Government." *Nat'l Treasury Emps. Union v. Nixon* ("*NTEU*"), 492 F.2d 587, 616 (D.C. Cir. 1974). In that case, the union challenged the President's alleged refusal to abide by a statute requiring him to grant a pay adjustment or propose an alternative to Congress, and the Court found that the duty at issue was a ministerial one that it had mandamus jurisdiction to enforce, but declined to do so, electing to issue a declaratory judgment that the President had a constitutional duty to effectuate the required pay raise. *See id.* Similarly, in *National Wildlife Federation v. United States*, 626 F.2d 917, 918, 921–22 (D.C. Cir. 1980), plaintiffs alleged a violation of a statute requiring the President to make certain disclosures and to include explanations when transmitting a budget request to Congress. The Court found that it could issue mandamus relief to perform a ministerial duty, but it exercised its discretion not to grant either mandamus or declaratory relief against the President, for doing so "would be improvident" for various reasons, including potential standing issues. *Id.* at 926–28. In 1992, however, the Supreme Court observed that whether the President could be subject to an injunction requiring performance of a purely ministerial duty was still an open question. *Franklin*, 505 U.S. at 802.

1013 (D.C. Cir. 2010) (stating, in dicta, that "courts do not have jurisdiction to enjoin" the President, and "have never submitted the President to declaratory relief").[13]

Understanding the principle that a ministerial duty must be involved, plaintiffs characterize the statutory duties underlying this case as "mandatory" and "non-discretionary." *See* Compl. ¶¶ 74, 76, 80, 95, 105. The D.C. Circuit has explained that "[a] ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Swan*, 100 F.3d at 977, citing *Mississippi*, 71 U.S. (4 Wall.) at 498 ("[A] ministerial duty . . . is one in respect to which nothing is left up to discretion."). "Generally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary [i.e., ministerial] if it involves enforcement or administration of a mandatory duty at the *operational level*." *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988) (emphasis in original), quoting *Jackson v. Kelly*, 557 F.2d 735, 737 (10th Cir. 1977). A ministerial duty has been described as "simple," "definite," and as leaving "no room for the exercise of judgment[.]" *NTEU*, 492 F.2d at 607–08. It must be "so plainly prescribed as to be free from doubt and equivalent to a positive command . . . . [W]here the duty is not thus plainly prescribed, but depends on a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion." *Consol. Edison Co. of N.Y. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002).

Plaintiffs' attempt to liken the statutory obligations here to a purely ministerial duty is inconsistent with the language of the provisions themselves and the decisions of this Circuit interpreting the PRA. Section 2203(a) of the PRA states:

13 *But see NTEU*, 492 F.2d at 616 (finding that the case "presents a most appropriate instance for the use of a declaratory decree").

> Through the implementation of records management controls and other necessary actions, the President shall take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records pursuant to the requirements of this section and other provisions of law.

44 U.S.C. § 2203(a).

The use of the word "shall" often denotes a mandatory obligation, but what the President must do is exercise his discretion, and the rest of the text calls for the exercise of considerable judgment. The PRA directs the President to take steps "as may be necessary," through "implementation of records management controls and other necessary actions[,]" to assure "adequate" documentation of Presidential activities. *Id.* This duty necessarily involves the application of judgment and the formation of policy. Indeed, the D.C. Circuit has observed that the PRA "accords the President virtually complete control over his records during his term of office." *Armstrong I*, 924 F.2d at 290; *Armstrong II*, 1 F.3d at 1291.

Any attempt to craft an injunction or declaratory judgment against the President or his staff based on the Federal Records Act would be even more problematical. *See* Compl. ¶¶ 87–88; *id.* ¶¶ 101–02. The FRA directs the head of each federal agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency[,]" that are "designed to furnish the information necessary to protect the legal and financial rights of the Government . . . ." 44 U.S.C. § 3101. The statute leaves open the question of what constitutes complete performance, and it cannot be described as an assignment of "simple" and "definite" duties that are "free from doubt and equivalent to a positive command." More important, plaintiffs do not point to any language in the FRA that imposes a clear duty on the President, or the Executive Office of the

President, and the complaint does not allege that any of the defendants violated such a duty. Claim Three alleges that the defendants' conduct "denies agencies access to and control of information needed to . . . comply with *their* obligations under the FRA[,]" Compl. ¶ 92 (emphasis added), and Claim Five seeks to address Presidential "interference with *the State Department's* compliance." *Id.* ¶ 105 (emphasis added).

Since the duties set forth in these statutes are not purely ministerial obligations imposed on the defendants, plaintiffs have not established the clear duty to act necessary to support the request for mandamus in Claim One, *CREW v. Trump*, 924 F.3d at 606, and the Court does not have jurisdiction to issue the declaratory and injunctive relief that plaintiffs have requested in Claims Two through Five. Therefore, pursuant to Federal Rule of Civil Procedure 12(b)(1), the Court will grant defendants' motion to dismiss.[14]

---

14 Some courts have addressed the court's authority to enjoin a President in the context of the standing analysis necessary to establish subject matter jurisdiction, and defendants have also argued that the claims must be dismissed on those grounds. *See* Defs.' Suppl. Br. at 4–6. The elements of constitutional standing are: "[t]he plaintiff[s] must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). If the court lacks the power to award injunctive relief and compel the President to perform discretionary duties, plaintiffs' injuries are not redressable. *Franklin*, 505 U.S. at 802–03; *Swan*, 100 F.3d at 980–81. So even if plaintiffs have sufficiently alleged that they have suffered an injury caused by the challenged conduct of the defendants, *see* Compl. ¶¶ 101–04, their inability to establish the third element necessary for standing provides another basis to dismiss the case under Federal Rule of Civil Procedure 12(b)(1).

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  February 10, 2020